## Page 1

UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO. 8:18-CV-00919-SCB-TGW

CRAIG CUNNINGHAM,
    Plaintiff,
-vs-
HEALTH PLAN INTERMEDIARIES
HOLDINGS, LLC d/b/a HEALTH
INSURANCE INNOVATIONS; and
DOES 1-100,

    Defendants.
_____/

DEPOSITION OF:    CRAIG CUNNINGHAM
DATE TAKEN:    Thursday, April 11, 2019
TIME:    10:12 a.m. to 3:26 p.m.
PLACE:    Greenspoon Marder LLP
    401 East Jackson Street
    Suite 825
    Tampa, Florida

REPORTED BY:    Niki Noojin, Professional
    Court Reporter
    Notary Public
    State of Florida at Large

## Page 2

1 APPEARANCES:
2 KELSEY L. KUBERKA, ESQUIRE
    Law Offices of Todd M. Friedman, P.C.
3     21550 Oxnard Street
    Suite 780
4     Woodland Hills, California 91367-7104
    866.598.5042
5     kelsey.kuberka@toddflaw.com
6     Appearing on behalf of the Plaintiff
7
    GARRY W. ODONNELL, ESQUIRE
8  DARIEL J. ABRAHAMY, ESQUIRE
    DAVID A. SCHNOBRICK, ESQUIRE (Appearing Telephonically)
9     Greenspoon Marder LLP
    2255 Glades Road
10   Suite 400-E
    Boca Raton, Florida 33431
11   561.994.2212
    garry.odonnell@gmlaw.com
12   dariel.abrahamy@gmlaw.com
    david.schnobrick@gmlaw.com
13
    Appearing on behalf of the Defendant,
14   Health Plan Intermediaries Holdings, LLC
15
    JANIS ROSENTHAL, ESQUIRE
16   Regulatory Counsel, Vice President Legal Affairs
    15438 N. Florida Avenue
17   Suite 201
    Tampa, Florida 33613
18   Jrosenthal@hliquote.com
19
20
21
22
23
24
25

## Page 3

I N D E X

TESTIMONY OF CRAIG CUNNINGHAM:    PAGE
Direct Examination by Mr. O'donnell    5
Certificate of Reporter    170
Certificate of Oath    171
Errata Sheet    172
Letter to Deponent    173
- - - - -

E X H I B I T S

EXHIBIT NUMBER    PAGE

Exhibit Number 1    64
    Second Amended Complaint
Exhibit Number 2    141
    Plaintiff's Response to Defendant's
    First Set of Requests to Production
Exhibit Number 3    143
    Exhibit A to Plaintiff's Production

Exhibit Number 4    143
    Exhibit B to Plaintiff's Production
Exhibit Number 5    143
    Exhibit C to Plaintiff's Production

Exhibit Number 6    151
    Exhibit D to Plaintiff's Production
Exhibit Number 7    151
    Exhibit E to Plaintiff's Production

Exhibit Number 8    155
    Exhibit F to Plaintiff's Production
Exhibit Number 9    159
    Exhibit G to Plaintiff's Production

## Page 4

Exhibit Number 10    160
    List of calls, Bates PL 001136
    through PL 001141

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)
6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 5

1    THE REPORTER: Would you raise your right
2 hand, please, sir.
3    Do you solemnly swear the testimony you are
4 about to give will be the truth, the whole truth,
5 and nothing but the truth?
6    THE WITNESS: I do.
7        CRAIG CUNNINGHAM,
8 having been first duly sworn, was examined and testified
9 upon his oath as follows:
10       DIRECT EXAMINATION
11 BY MR. O'DONNELL:
12    Q   Can you provide us with your full name,
13 please?
14    A   Craig Ruselmani Cunningham.
15    Q   Middle initial [sic] Russell?
16    A   Ruselmani.
17    Q   Manny, M-A-N-N-Y?
18    A   M-A-N-I.
19    Q   M-A-N-I?
20    A   M-A-N-I.
21    Q   Okay. So it's Russell -- it's Craig --
22    A   Ruselmani Cunningham.
23    Q   Cunningham. Okay.
24        Well, good morning, Mr. Cunningham. My name
25 is Garry O'Donnell. I'm an attorney that represents

Page 6

1 Health Insurance Innovations. It's the company that
2 you've sued in this lawsuit, and next to me is Dariel
3 Abrahamy, who is my partner. And you're here today for
4 your deposition.
5        Have you had a deposition taken before?
6    A   I've had a few.
7    Q   Okay. Are you familiar with the process?
8    A   I am.
9    Q   All right. Do you feel comfortable enough to
10 participate today in a deposition?
11    A   Sure.
12    Q   And any conditions or medications that might
13 affect your testimony here today?
14    A   I don't think so.
15    Q   Okay. And I see you've brought your attorney
16 with you?
17    A   Yes.
18    Q   Okay. First of all, if you need a comfort
19 break or anything, just let us know. It's not an
20 endurance test.
21    A   Okay.
22    Q   And though one rule is -- that's important is
23 try to -- and I violate this all the time myself, but
24 try to speak slowly so the court reporter can get
25 everything down, and also verbalize your responses

Page 7

1 because it's hard for the court reporter to take down
2 "um-hum" or "hum-um." So if you could say "yes" or "no"
3 and articulate your responses that would be helpful.
4    A   Sure.
5    Q   Okay. Mr. Cunningham, what's your residential
6 address?
7    A   It's 3000 Custer Road, Plano, Texas 75075.
8    Q   How long have you lived at that address?
9    A   I've been in Plano for several years.
10    Q   So beginning what year?
11    A   I'm not sure. I think it was 2018, 2017,
12 several years.
13    Q   2017 or 2018?
14    A   Yes.
15    Q   Okay. And before that, Mr. Cunningham, where
16 did you reside?
17    A   In Dallas.
18    Q   What address?
19    A   9914 Crystal Valley Way.
20    Q   And that's in Dallas, Texas?
21    A   Yes.
22    Q   What years did you live there?
23    A   It was before that for six months, nine
24 months, something like that.
25    Q   Six to nine months?

Page 8

1    A   Yes.
2    Q   So would that have been in 2017 or 2018?
3    A   2017 or 2016.
4    Q   And before the Dallas address, where did you
5 live?
6    A   In Nashville, Tennessee.
7    Q   What address, sir?
8    A   4120 Nolensville Pike.
9    Q   And that was in Nashville, Tennessee?
10    A   Correct.
11    Q   How long did you live there?
12    A   About a year or so.
13    Q   So in 2016?
14    A   Maybe '15 through part of '16.
15    Q   And then before the Dallas address, where did
16 you live?
17    A   I think you already asked that.
18    Q   Before the Nashville address?
19    A   Oh, okay. I lived in Nashville for several
20 years.
21    Q   For 2015 to 2016?
22    A   In Nashville probably going back to 2011.
23    Q   Okay. So prior to the 4120 -- Nolensville did
24 you say?
25    A   Yes.

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 9

1    Q   Where did you reside?
2    A   It was a house somewhere in Nashville.  I
3   don't remember the address.
4    Q   You don't remember the address?
5    A   No.
6    Q   Would your tax returns list your proper
7   addresses for the time you filed your tax returns?
8    A   Tax returns don't really have anything to do
9   with this.  This is about telemarketing.  Right?
10   Q   It is, but --
11   A   Okay.
12   Q   -- what I'm trying -- what I'm trying to
13   inquire is the various places that you lived.  It's
14   normal protocol for a deposition.  And so from 2015
15   through 2016, it sounds like you lived at addresses
16   other than one -- others than the one you gave me.  So I
17   was asking you if you --
18   A   Other than which ones I gave you?
19   Q   The 4120 Nolensville Road?
20   A   Oh, yes.  There were addresses before that.
21   Q   So prior to 4120 Nolensville, where did you
22   live?
23   A   Like I say, I don't recall.  Pretty sure the
24   addresses on my tax returns would say 5543 Edmondson
25   Pike; but as I stated, they wouldn't -- the tax returns

Page 10

1   are not relevant to this case.
2    Q   Okay.  But where you lived is.  So that's what
3   I'm trying to determine is where you lived.
4    A   Right.  Nashville, Tennessee.
5    Q   Okay.  And for how long did you live in
6   Nashville, Tennessee?
7    A   As I stated previously, for probably about
8   four years, three or four years.
9    Q   Okay.  And for those three or four years, you
10   would have either lived at 4120 Nolensville or the 5541
11   Edmonds Pike [sic] address?
12   A   5543 Edmondson Pike.  It's a mailing address
13   I've had for several years.
14   Q   All right.  I was going to get into mailing
15   addresses and business addresses separately.  So what I
16   was trying to get into is your residential address.
17   Do you understand the difference?
18   A   Of course.
19   Q   And where you lived?
20   A   Sure.
21   Q   Okay.  So from 2015 to 2016, you lived in
22   Nashville at 4120 Nolensville Pike?
23   A   Yes.
24   Q   Okay.  And before that, where did you live in
25   Nashville?

Page 11

1    A   You are kind of repeating the same question.
2   You're not really going to get too much of a different
3   answer.
4    Q   What's your answer?
5    A   Again, a couple different houses.  I know one
6   was 415 Basswood.  The other one I don't really recall.
7    Q   415 Bass --
8    A   415 Basswood.
9    Q   And a third that you don't recall?
10   A   Correct.
11   Q   And so the 5543, that was a mailing address,
12   not a residence?
13   A   Correct.
14   Q   Are there any other residential addresses that
15   you lived at during the period of time that you resided
16   in Nashville that you haven't given me?
17   A   Yes.  As I stated, I don't recall them.
18   Q   All right.  How many were there?
19   A   One or two.
20   Q   Okay.  For what period of time?
21   A   One was maybe two months.  Another one was
22   maybe a year, two years.
23   Q   And so the -- just so I'm clear on it, the
24   period of time that you would have resided in Nashville
25   in years, was it 2016 to 2014?

Page 12

1    A   As I stated previously, it was about four
2   years, from about 20- -- 2011 through 20- -- beginning
3   of 2016, maybe.  So that's memory.
4    Q   Okay.
5    A   As memory serves, and like I said, it's -- I'm
6   not clear myself.  So I'm not sure how you are going to
7   be clear on it, but somewhere around four,
8   four-and-a-half years.
9    Q   All right.  And before Nashville, where did
10   you reside?
11   A   I was in Dallas for a bit.
12   Q   Do you recall what time frame?
13   A   It was before 2011.
14   Q   Okay.  How many years?
15   A   About a year, year and a half, something like
16   that.
17   Q   So it would be about 2010 to 2011, 2000 --
18   A   Sure.
19   Q   And then before Dallas, where did you reside?
20   A   El Paso, Texas.
21   Q   Now, the 2010-2011 period that you lived in
22   Dallas, what was your address?
23   A   I don't really recall.
24   Q   How about El Paso, Texas?
25   A   Again, City of El Paso, Texas, is about the

3 (Pages 9 to 12)

Page 13

1  best I can do.
2      Q   What?
3      A   The City of El Paso, Texas, is the best I can
4  do.  I don't recall.
5      Q   All right.  What time frame?
6      A   It was before 2010, so pretty much there for
7  the most part.  2008 and -- yes, mostly 2008 and before
8  that to about 2003.
9      Q   So from 2003 to 2010?
10     A   2003 to 2008.
11     Q   Okay.  So I have you in Dallas from 2010 to
12  2011, and then you said that you lived in El Paso,
13  Texas, prior to Dallas, and so I'm trying to make sure I
14  understand the years.
15     A   Is there a question?
16     Q   Um-hum.  What time frame did you live in
17  El Paso, Texas?
18     A   Again, we kind of went over that.  So before
19  2000 -- from 2008 before -- and prior.
20     Q   All right.  I have you living in Dallas from
21  2010 to 2011, and then I have you living in El Paso,
22  Texas, from 2008 to 2010, I thought you said first.  And
23  you mentioned some other time frame.
24     A   No.  It's 2008 and before in El Paso, Texas,
25  and -- maybe it was 2009 in Dallas.  I -- like I said, I

Page 14

1  don't really recall.  It was a while ago.
2      Q   Okay.  So how many different occasions did you
3  live in El Paso?
4      A   I'm not sure.  What do you mean?
5      Q   How many different occasions did you live in
6  El Paso?  Did you just live there once or multiple
7  times?
8      A   Again, repeating the same question that you
9  just asked, it's not very clear.  It doesn't clarify the
10  question any.
11     Q   Okay.  Well, let's go back to Dallas.  You
12  don't remember what address you lived at in Dallas?
13     A   Not specifically.
14     Q   Okay.  And you think the time frame is 2010 to
15  2011?
16     A   It could have been 2009 to --
17     Q   Maybe 2009?
18     A   -- '10, something -- something like that.
19     Q   All right.  And so then before Dallas you
20  lived in El Paso?
21     A   Correct.
22     Q   And can you tell me the years that you lived
23  in El Paso?
24     A   Going on the third time now, but roughly from
25  2003 through 2008.

Page 15

1      Q   Okay.  So if you lived in El Paso from 2003 to
2  2008, did you live in Dallas from 2008 to 2011 -- 20- --
3  2010 to 2011?
4      A   As I stated, it may have been 2009 when I --
5  beginning of 2009, something like that.  If you're
6  looking for a specific answer, I can't give you one.
7      Q   Okay.
8      A   So that's the general time frame and general
9  locations.
10     Q   All right.
11     A   I will clarify one thing, though, I did spend
12  a fun-filled year in South Korea in the Joint Security
13  Area.
14     Q   Okay.  What year was that?
15     A   2006 or 2007.
16     Q   That was when you were on active duty?
17     A   Yes.
18     Q   You were assigned there?
19     A   Yes.
20     Q   Who was your commanding officer?
21     A   I don't remember.  He was a colonel.
22     Q   Okay.  So El Paso, some -- you lived in
23  El Paso sometime around 2003 to 2008 or '9 and then
24  moved to Dallas?
25     A   Correct.

Page 16

1      Q   Except for one year or so, which is 2006 or
2  2007, when you were on active duty and stationed in
3  South Korea?
4      A   Correct.
5      Q   Okay.  Thank you.
6          May I have your date of birth, please?
7      A   ██████, 1980.
8      Q   And your place of birth?
9      A   Detroit, Michigan.
10     Q   Your social security number?
11     A   ██-█-5558.
12     Q   And we talked about your residential
13  addresses.
14         Have you also used mailing addresses, like
15  post office box addresses?
16     A   Sure.
17     Q   Okay.  And do you recall which post box office
18  addresses you used?
19     A   No.
20     Q   Except for that 5543?
21     A   Well, I still use that.
22     Q   Okay.  How long have you had that one?
23     A   Several years.
24     Q   And that's in Nashville?
25     A   Correct.

4 (Pages 13 to 16)

Page 17

1     Q   What do you use that for?
2     A   Receiving mail.
3     Q   Personal mail?  Business mail?
4     A   Mail.
5     Q   Okay.  Well, how do you decide when to use the
6  5543 mailing address versus other places you've lived?
7     A   I generally use it for most -- most things.
8  Sometimes if I'm really in doubt, I might flip a coin.
9     Q   Okay.  What kind of doubt would you have?
10    A   I don't know.  Like I said, I use it for most
11  mail.
12    Q   Personal mail?
13    A   If it's in an envelope and it's addressed to
14  me, I usually have it sent there.
15    Q   Okay.  Have you ever gone by any other names
16  other than the one that you gave us here at your
17  deposition today?
18    A   I'm not sure what you mean.
19    Q   Have you ever used any other names or gone by
20  any other names other than the one that you gave us here
21  today?
22    A   Again, repeating the same question, that's not
23  particularly clear and it's pretty vague.  It's not
24  clarifying to the question.
25    Q   What is it that you don't understand about it?

Page 18

1     A   I mean, have I ever used any names, used any
2  names how?
3     Q   In any way?
4     A   Sure.
5     Q   Well, give me an example.
6     A   From gaming online, I usually use a different
7  name than Craig Cunningham.  I don't think I have ever
8  gone by Craig Cunningham by gaming online.
9     Q   Okay.  And what name do you use for gaming
10  online?
11    A   Depends on the game.  Whatever strikes my
12  fancy at the time.
13    Q   Have you ever used a different name to
14  purchase a service or a product?
15    A   Rarely.
16    Q   Okay.  On those occasions, then, that you did,
17  what name did you use?
18    A   It depends on the specific product and service
19  and instance that you are talking about.
20    Q   All right.  Well, let's start with whatever
21  one you would like to talk about first.
22    A   I wouldn't -- you're asking the questions.  I
23  can't -- I can't ask and answer the questions.  So if
24  there is a specific question or instance or purchase
25  that you want to talk about it, again, I'm happy to --

Page 19

1  I'm happy to dive right into that.
2     Q   Thank you.  Thank you.  Let me see if we can
3  get to it.
4        Give me an example of a product or a service
5  that you have purchased using a different name?
6     A   Okay.  When I get calls from Card Services, as
7  I call, it usually starts off with a prerecorded message
8  and says, "This is Rachel with Card Services calling to
9  lower your credit card interest rates," sometimes I use
10  a different name with them.
11    Q   Okay.  Give me an example of a different name
12  that you've used.
13    A   Greg Jones.
14    Q   Craig or Greg?
15    A   Greg.
16    Q   Greg.  Give me another example of a name
17  you've used?
18    A   Greg Jackson.
19    Q   Okay.  Give me another name -- example of a
20  name that you've used.
21    A   That's all I can think of right now that
22  springs to mind.  Again, if there is a specific call or
23  instance that you want to ask about, I'm here for you.
24    Q   All right.  Well, thank you.  I appreciate
25  that.  I was just asking about the best answer you could

Page 20

1  give me under oath to my questions.  That's all.  So if
2  there are any other names you can remember, I would like
3  you to provide them?
4     A   I get annoying, harassing telemarketing calls
5  every day multiple times a day.  So, you know, probably
6  to the tune of thousands a year.  So it's just kind of
7  hard to pick out a specific conversation.  But like I
8  said, those are just the two that I -- that most
9  immediately spring to mind.
10    Q   Okay.  So if I understand your testimony
11  correctly, Mr. Cunningham, you used so many or make up
12  so many names that you just can't remember them all?
13    A   I didn't say that.
14    Q   Okay.  Well, exactly what are you saying?
15    A   I said I gave you two specific examples of --
16  that I can think of where I've used names other than
17  Craig Cunningham -- actually, three for including the
18  gaming.  There you go.
19    Q   Let's take out the gaming because we moved on
20  to products and services.
21    A   Okay.
22    Q   Can you remember any of the other various
23  names that you've used?
24    A   Not really.
25    Q   Okay.  Have you used 50 different new names?

5 (Pages 17 to 20)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 21

1    A   I can't -- like I said, I can remember a
2  couple of specific instances of names that -- again, it
3  kind of happened recently.  Beyond that, you know, I
4  would really have to look at -- listen to the call
5  recordings or -- you know, if you want to talk about a
6  specific instance or something like that, I'm happy to.
7  But, you know, out of thousands and thousands of calls,
8  it's really hard to remember specific instances of what
9  happened and transpired without listening to call
10  recordings.
11    Q   Okay.  So you just -- you just use whatever
12  name you think of?
13    A   No.  As I stated, I usually use Craig
14  Cunningham.
15    Q   Okay.  How do you decide when to use Craig
16  Cunningham versus some other name?
17    A   Depends on the call and the nature of it and
18  the circumstance.
19    Q   Well, give me an example.
20    A   I just did.  I gave you two examples.
21    Q   All right.  Give me an example of -- help me
22  distinguish between when, if you got a call, you would
23  use your own name versus make up a name?
24    A   I can repeat the same question and have the
25  court reporter -- or same answer or have the court

Page 22

1  reporter repeat it back.  Those are two examples.
2    Q   You could do that.  But I'm trying to ask you
3  a little bit of a different question, and that is not
4  the specific instances, but when -- help me understand
5  when, what types of calls that you would give your real
6  name versus make up another name?
7    A   As I stated, most of the time I use my real
8  name.  It just depends.
9    Q   Okay.
10    A   There is no hard and fast procedure.  There is
11  no rules to this.  Just is what it is.
12    Q   Okay.
13    A   Again, if you want to ask me about a specific
14  instance or call or circumstance, I'm happy to tell you
15  why I, on this time, did whatever I did, again, to the
16  best of my knowledge and recollection.
17    Q   Have you ever been arrested or convicted of a
18  crime?
19    A   I don't know if traffic tickets count.
20    Q   No.
21    A   Okay.  No.
22    Q   They don't count for me anyhow.
23    The -- I would like to talk to you a little
24  bit about your employment history.  Where are you
25  presently employed?

Page 23

1    A   That assumes facts not in evidence.
2    Q   Okay.  I get to ask you where you're employed.
3    A   I mean, you can; but, I mean, I'm just saying
4  that assumes -- you know.
5    Q   So you are unemployed?
6    A   I didn't say that.
7    Q   All right.  Are you employed?
8    A   I guess it depends on how you define
9  "employed."
10    Q   Okay.  Is that the best answer you can give
11  me?
12    A   I mean, the specific answer to vague question.
13    Q   Are you employed is a vague question?
14    A   It -- I'm asking -- I'm saying a more specific
15  definition of "employment."
16    Q   When is the last tax return that you filed?
17    A   I don't know.  I guess I would have to ask the
18  IRS that.
19    Q   Okay.  And did anybody issue you a W-2 for the
20  year 2018?
21    A   I don't recall having -- I usually like to get
22  a transcript of everything.  I haven't -- I think I
23  asked for that.  I don't think I've seen it yet.
24    Q   When is the last time you had a job?
25    A   I mean, it depends on what you consider a job.

Page 24

1  I mean, you know, I've heard body building, you know, is
2  a 24-hour-a-day job.  I've heard it described as that.
3    Q   Heard what described as that?
4    A   Body building.
5    Q   Your own personal body building, or are you a
6  trainer is what you're saying?
7    A   Are you familiar with the concept of body
8  building?
9    Q   I just was going to go through your employment
10  history, and it usually doesn't take very long.  But,
11  obviously, I'm not asking very good questions, so --
12    A   You said it.  I didn't.
13    Q   All right.  Well, I'm going to try to get
14  better.
15    A   Okay.
16    Q   See if we can get some answers.
17    How do you earn a living?
18    A   Earn a living?
19    Q   Yes.
20    A   Sounds like a term of art.
21    Q   Okay.  How do you support yourself?
22    A   I usually stand up on my two legs.
23    Q   Financially?
24    A   With money.
25    Q   Okay.  Where do you get the money?

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 25

1    A   I already have it.
2    Q   Okay. Where did it come from before it got to
3    you?
4    A   A bank, usually.
5    Q   And where did it come from before it got to
6    the bank?
7    A   I'm not the custodian of the bank's money.
8    Q   Okay. So I'm going to ask you once just one
9    more time, Mr. Cunningham. Are you presently employed
10   or not?
11   A   I mean, employed doing what?
12   Q   Employed with a job, with an employer where
13   you go to work and earn a paycheck and then the employer
14   gives you a W-2 and you report it on your income taxes?
15   A   Oh, no. I'm not a W-2 employee.
16   Q   Okay. When is the last time you were a W-2
17   employee?
18   A   Maybe 2016.
19   Q   And where were you employed in 2016?
20   A   Amazon.
21   Q   What was your job with Amazon?
22   A   Operations manager.
23   Q   And where is that located?
24   A   That was in Nashville.
25   Q   And who was your supervisor?

Page 26

1    A   I don't recall.
2    Q   How long did you work at Amazon?
3    A   Several years.
4    Q   Can you provide me a range?
5    A   Three or four years.
6    Q   So --
7    A   Maybe it's two or three.
8    Q   So from 2013 to 2016?
9    A   Sure, something like that.
10   Q   And what did you do as an operations manager?
11   A   Managed operations.
12   Q   In what area?
13   A   Warehouse. Actually, they call them
14   fulfillment centers to be technically correct.
15   Q   And before your job with Amazon, how were you
16   employed?
17   A   I worked at Walmart.
18   Q   What was your position at Walmart?
19   A   Store manager.
20   Q   And what years did you work at Walmart as a
21   store manager?
22   A   2010 to '13 or so before Amazon.
23   Q   And where did you work for Walmart?
24   A   That was in Nashville as well, although I did
25   training in Louisiana.

Page 27

1    Q   So why did you leave Walmart 2013?
2    A   Because I liked Amazon. Amazon was building
3    new fulfillment centers, so --
4    Q   Why did you leave Amazon?
5    A   I just wanted to start my own business.
6    Q   Okay. And so in 2016 you started your own
7    business?
8    A   I bought one, yes.
9    Q   And what business is that?
10   A   It's a money service business.
11   Q   And what does that business do?
12   A   Generally speaking, it's check cashing, bill
13   payments, Western Union, that sort of thing.
14   Q   How does that work?
15   A   What do you mean?
16   Q   How does your business model work?
17   A   Are you unfamiliar with the idea of a
18   check-cashing business or Western Union payments?
19   Q   Yes. I would like you to describe it. I want
20   to make sure my understanding is the same as yours?
21   A   Oh, okay. It's pretty self-explanatory. But
22   with the check-cashing business, you cash checks for a
23   fee.
24   Q   Okay.
25   A   With Western Union, you send and receive

Page 28

1    payments through Western Union. It's a money
2    transmission service, and for a fee you, you know, do
3    transactions, send and receive money.
4    Q   Does your business have a physical location?
5    A   Yeah.
6    Q   Where is it located?
7    A   It was located at 4120 Nolensville Pike, and I
8    had another one somewhere in Nashville on Murfreesboro
9    Pike.
10   Q   Are you still in that business?
11   A   No.
12   Q   How long did you have that business?
13   A   About a year, maybe a little more.
14   Q   Okay. And what was the reason for closing
15   that business?
16   A   I sold it.
17   Q   Okay. So you bought it, and then you sold it?
18   A   That is correct.
19   Q   After about a year?
20   A   Yes.
21   Q   Okay. So I guess that brings us up to 2017 or
22   so. What have you -- have you had a job or engaged in a
23   business since 2017?
24   A   I sell on Amazon as a third-party seller.
25   Q   How long have you been doing that?

7 (Pages 25 to 28)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

## Page 29

1  A  I think you kind of spelled it out, the time
2  frame.
3  Q  I didn't know if you were doing it before or
4  not.
5  A  Oh.
6  Q  So after your check-cashing business, then you
7  went to work as a third-party seller in Amazon?
8  A  Correct.
9  Q  Okay.  Any particular products or services?
10  A  Mostly sports nutrition products; but if it
11  will sell, I'll sell it.
12  (Ms. Rosenthal joined the proceedings.)
13  MR. O'DONNELL:  Mr. Cunningham, this is Janis
14  Rosenthal.
15  And this is Kelsey.
16  MS. KUBERKA:  Kuberka.
17  MR. O'DONNELL:  Mr. Cunningham's attorney.
18  Janis Rosenthal is a representative of the
19  defendant, Health Insurance Innovations.
20  BY MR. O'DONNELL:
21  Q  So the third-party seller business that you
22  conduct through Amazon, is that your sole means of
23  financial support right now?
24  A  No.
25  Q  Okay.  What other income-generating activities

## Page 30

1  are you involved in?
2  A  I think it depends on how you define "income."
3  Q  Money.
4  A  That's not how I define it.
5  Q  Okay.
6  A  That's not how the IRS defines it.
7  Q  Well, let's use your definition, then.  How
8  would you define it?
9  A  I don't.
10  Q  Okay.  How would the IRS define it?
11  A  I mean, there is IRS publications and what are
12  various income, earned income.  All that is defined.
13  I'm not a representative of the IRS.  I don't write
14  their publications.  I'm just -- I just read them and
15  understand.
16  Q  So other than your activities as a third-party
17  seller on Amazon, how do you earn money?
18  A  Well, I have investments, stocks, mutual
19  funds, and so forth.
20  Q  Other than investments, are there any other
21  means that you earn money?
22  A  Yeah, gamble and so forth, occasionally.
23  Q  The gambling a profitable venture for you?
24  A  I hope so.
25  Q  Okay.

## Page 31

1  A  Most of the time.
2  Q  Good.  Online?  Do you go to Vegas?  How does
3  that work?
4  A  I've been to Vegas.  Vegas to me is more for a
5  little bit of entertainment than purely gambling.  There
6  is a casino about an hour north of Dallas.
7  Q  Okay.  Like card games?
8  A  Yeah, card games, slots.  I'm a big fan of
9  poker.
10  Q  Poker?
11  A  Um-hum, oh, yeah.
12  Q  Do you play in -- competitively?
13  A  I've played in tournaments and stuff before,
14  not -- you are not going to see me on the World Series
15  of Poker any time soon.  But that -- one of these days,
16  I think I'm going to do it, just, you know -- if, you
17  know, have the time and everything.
18  Q  Okay.
19  A  It's kind of -- the only down side to that is
20  it's, you know, a lot of sitting.  You know what they
21  say.  Sitting is the new smoking, so --
22  Q  So you said you sell sports and fishing
23  products.  Do you do --
24  A  No.  No.  No.  Sports and nutrition.
25  Q  Oh, nutrition.  Okay.  Got you.

## Page 32

1  Now, I'm going to ask you a few questions
2  about the telephone communication -- Telephone Consumer
3  Protection Act.  Are you familiar with that?
4  A  I've heard of it, yes.
5  Q  And I'm going to use the acronym TCPA for
6  short.  Will that work?
7  A  You can call it whatever you want to.
8  Q  Okay.  Well, you'll understand, when I use
9  that acronym, that I'm referring to that statute?
10  A  Sure.
11  Q  So over the years, Mr. Cunningham,
12  approximately how many TCPA-related lawsuits have you
13  brought as a plaintiff?
14  MS. KUBERKA:  Objection; relevance.
15  BY MR. O'DONNELL:
16  Q  Well, let me ask you, for 2018, how many
17  pending TCPA lawsuits are you involved in?
18  A  I don't recall.  I haven't counted.
19  Q  Okay.  Is -- do you make money from doing
20  that?
21  A  I think that's -- you know, it depends on each
22  and every case.
23  Q  All right.  Is any of the money that you make
24  from asserting TCPA claims or filing lawsuits, the
25  recoveries that you make, do you report those recoveries

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                      6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 33

1  on your tax return?
2     A  I believe you are supposed to.
3     Q  Okay.  But do you?
4     A  What I report on my taxes is, again, not
5  relevant and pretty much between me and the IRS.
6     Q  Okay.  Well, I do have a series of questions
7  where I would like to ask you about the amount of income
8  that you generate from these types of cases, and here in
9  the Middle District of Florida relevancy isn't an
10  objection that you can assert to keep a witness from
11  answering a question.  This is discovery.
12     MS. KUBERKA:  Notice I didn't tell him not to
13  answer.
14     MR. O'DONNELL:  Okay.  I just wanted to make
15  sure it's clear.
16  BY MR. O'DONNELL:
17     Q  So let's go back to the number of TCPA
18  lawsuits that you filed.  Can you give me a general
19  idea?
20     A  Ever?
21     Q  Yes.
22     A  I don't recall.  I didn't count them.
23     Q  What year did you file your first one?
24     A  I -- you know, I would have to defer to PACER
25  and whatever's -- whatever's on the --

Page 34

1     Q  About 2006?
2     A  I don't know.
3     Q  Okay.
4     A  If you want to ask me about a specific case, I
5  can look over it and say "yes" or "no," but --
6     Q  We have a list, and we can go over it.  Is
7  just a matter of sometimes, Mr. Cunningham, you can get
8  through information quicker in a deposition in just
9  asking questions with the witness, but we certainly have
10  all of the information, and we will go through each page
11  of it.
12     A  Okay.
13     Q  But I just wanted to ask you generally if you
14  had an idea how many TCPA cases that you've brought.
15     A  It sounds like you have a better idea than I
16  do.
17     Q  So you don't even have an estimate that you
18  can give me?
19     A  More than one.
20     Q  More than a hundred?
21     A  If you've counted it, you've done more on that
22  front than I have.
23     Q  Have you ever counted them?
24     A  I have not personally, no.  I don't take time
25  to count my case.  I don't have a tally on the wall.

Page 35

1     Q  Have you ever been interviewed for articles
2  where you've expressed to people the number of TCPA
3  lawsuits that you've brought?
4     A  I don't know if I've been interviewed for it.
5  You know -- I don't do a lot of interviews anyway; but
6  if you have a specific interview you want to talk about,
7  just go ahead and let me know.
8     Q  Okay.  So as you sit here today, you can't
9  tell me approximately how many TCPA lawsuits you've
10  filed?
11     A  As I stated, I don't count them.
12     Q  Okay.  I'm not asking for a precise number,
13  Mr. Cunningham.  I'm just asking you, as you sit here
14  today, your best recollection, best estimate of how many
15  TCPA lawsuits you've filed?
16     A  I've filed several.
17     Q  More than a hundred?
18     A  It's entirely possible.  Again, I -- I'm happy
19  to -- you know, if you want to count them, we can count
20  them right now.
21     Q  And how many claims that weren't lawsuits did
22  you assert?
23     A  That's even a more vague and ambiguous number
24  than the number of filed TCPA lawsuits, which I haven't
25  counted either, so --

Page 36

1     Q  Okay.  Would that be more than a hundred?
2     A  It's an unknown quantity plus another unknown
3  quantity, if you are going to look at filed cases versus
4  claims.
5     Q  Okay.  And have you filed your tax return for
6  2018 yet?
7     A  No, not yet.
8     Q  Okay.  Have you filed a tax return for 2017?
9     A  Not sure.  I would have to double-check.
10  Probably not.
11     Q  For 2016?
12     A  I would have to check with the IRS.
13     Q  To the best of your recollection, the last tax
14  return you filed, how much TCPA-related income did you
15  disclose on your tax return?
16     A  I have to -- calls for speculation.  I'm
17  really not sure.  I don't know that I reported any or
18  how it was exactly classified.  I don't really look at
19  it, and I don't think the IRS looks at it as income.
20     Q  So for 2018, you derived income as a
21  third-party seller on Amazon; correct?
22     A  Correct.
23     Q  Selling sports and nutrition products?
24     A  Correct.
25     Q  And you have investments.  I want you to set

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 37

1  that aside.  That's kind of passive income, okay.  And
2  you talked about your gambling ventures; right?
3      A  I gamble a little bit.  Yeah.
4      Q  And then you have a certain amount of
5  TCPA-related recoveries that are occurring in 2018;
6  correct?
7      A  Something.  I mean, they were damages that I
8  recovered.
9      Q  Okay.  That's what I'm talking about.
10     A  Okay.
11     Q  Recovery, damages that you recovered from
12  claims in lawsuits that you've made; correct?
13     A  Yes.
14     Q  Okay.  So for 2018, based on an income of,
15  say, a hundred dollars, how many dollars would be
16  attributed to TCPA settlements and claims?
17     A  I don't know.
18     Q  Okay.
19     A  I haven't counted.
20     Q  Is it 25 percent, 30 percent, 40 percent?
21     A  Again, calls for speculation.  I haven't
22  counted.
23     Q  Okay.  Is it a significant amount?
24     A  Again, we can keep going through this.  I
25  haven't counted.

Page 38

1      Q  All right.  Just your sense of -- I mean, you
2  know how much you earn as a third-party seller on
3  Amazon.  You know how much you earn as a gambler.  You
4  know what your recoveries are in your TCPA lawsuits.
5  I'm just trying to get an understanding of what
6  percentage of the money that you make in 2018, what
7  percentage of it was related to TCPA claims and
8  lawsuits?
9      A  Again, my sense is it's vague, ambiguous, not
10  calculated, and calls for speculation.
11     Q  Okay.
12     A  Beyond that, I haven't counted.
13     Q  Can you answer the question I asked you?
14     A  I did.  I haven't counted.
15     Q  Well, you gave me a lawyer's objection, but
16  you didn't give me an estimate of the percentage.
17     A  I can't.
18     Q  Okay.
19     A  I haven't counted.  I keep saying I haven't
20  counted.
21     Q  You keep saying "ambiguous" --
22     A  I'm still -- it's -- but I haven't counted.
23  That's my response.  I don't know.  I haven't counted.
24  I haven't counted.  I'm not going to count in five
25  minutes, and I'm not going to count in the next seven

Page 39

1  hours.  So I don't know.  I haven't counted.
2      Q  Okay.  If you were going to count, what would
3  you look at?
4      A  I guess you would have to look at every
5  settlement, confidential settlement, judgment, so forth
6  and add it up, assuming, you know, I still have records
7  of all that.
8      Q  Do you for 2018?
9      A  I don't know.  Probably not.
10     Q  All right.  Can you give me an estimate of
11  what percentage of your income for 2018 came from these
12  TCPA-related activities?
13     A  I -- that's really vague.
14     Q  A third?  A half?
15     A  I don't know what a TCPA-related activity is.
16     Q  Claims, settlements, recoveries from claims
17  and lawsuits that you've made.
18     A  Yeah.  Again, I haven't counted.  If you don't
19  do the math, I'm am not going to -- you are not going to
20  get a number.  Just doesn't work that way.  Unless you
21  do the math, you don't get a number.
22     Q  Do you presently or have you ever held any
23  professional licenses?
24     A  No, not that I know of.  Not that I recall.
25     Q  Do you have a college education?

Page 40

1      A  I do.
2      Q  Okay.  Where did you graduate?
3      A  I went to West Point.
4      Q  And what type of degree did you graduate with?
5      A  A bachelor's in science and economics.
6      Q  Any postgraduate education?
7      A  Yes.  I have an MBA and a master's in finance
8  from Northeastern University.
9      Q  Northeastern?
10     A  Yes.
11     Q  In Boston?
12     A  In Boston.
13     Q  And what year did you receive your master's?
14     A  I want to say it was 2016 or '17, as I recall.
15     Q  In what area did you receive that degree?  Any
16  specialization other than --
17     A  Supply chain.
18     Q  Supply chain.
19        Now, you spoke briefly about your military
20  service.  What branch and dates were you in the military
21  service?
22     A  Well, if you include West Point and -- I went
23  to a prep school in 1998 and then four years at West
24  Point.  And then '99 to 2003.  And then 2003 to 2008 I
25  was active duty in the Air Defense Branch.

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 41

1    Q   And were you honorably discharged?
2    A   Yes.
3    Q   That was 2008?
4    A   2008, yes.
5    Q   Okay.  Presently how many cellphone numbers do
6    you have for your personal use?
7    A   Three.
8    Q   And what are those numbers?
9    A   615-348-1977, 615-212-9191, and 615-331-7262.
10   Q   So the first number is 615-348-1977?
11   A   Correct.
12   Q   How long have you had that number?
13   A   Several years.
14   Q   And the second number you gave me is
15   615-212-9191?
16   A   Correct.
17   Q   And how long have you had that number?
18   A   Several years.
19   Q   And then 615-331-7262?
20   A   Yes.
21   Q   And those are the numbers that you currently
22   have?
23   A   That's -- that's correct.
24   Q   And 7262 you've also had for several years?
25   A   Yes.

Page 42

1    Q   Have you had any other cellphone numbers in
2    the last five years?
3    A   Maybe.  Maybe.
4    Q   Do you recall what numbers?
5    A   No.
6    Q   You don't?
7    A   I probably had them for a brief period of
8    time.
9    Q   Okay.  Do you presently have a landline
10   number?
11   A   No.
12   Q   When is the last time had you a landline
13   number?
14   A   Maybe ten years ago -- I don't -- it's been a
15   long time.  Probably longer than that.
16   Q   Do you have any business telephone numbers?
17   A   No.
18   Q   For your cellphones, who are your service
19   providers?
20   A   Verizon Wireless for the last two, and for
21   1977 it's Republic Wireless.
22   Q   In the last five years, other than the three
23   cellphone numbers that you've given me, if I understand
24   correctly, you don't have any other telephone numbers,
25   residential, personal, or business, that you use?

Page 43

1    A   In the last five years, I've had other numbers
2    that I use.
3    Q   They were only the cellphone numbers?
4    A   Those are the cellphone numbers that I've
5    used.
6    Q   Okay.
7    A   That I recall.
8    Q   So you have other cellphone numbers that you
9    can't recall?
10   A   No.  Well, yes.  I've had a couple other
11   cellphone numbers that I don't recall because I had them
12   for a brief period of time.
13   Q   All right.  And why did you have those
14   cellphone numbers for a brief period of time?
15   A   Usually, it's when I was getting a service
16   started up, and then I'd forward over the -- those
17   numbers that I've had for a while.  Or I think if -- for
18   a period of time, I think I had a different number when
19   I was with Republic Wireless, but they couldn't forward
20   it.  So I just -- I mean, I can't -- couldn't use it
21   anymore.  So I had to drop it and get another number.
22   Q   All right.  So the numbers were changed as a
23   result of changing service providers is what you're
24   saying?
25   A   Yes.

Page 44

1    Q   And I thought you told me you had no landline
2    in the last ten years?
3    A   Correct.
4    Q   And you don't have any business telephone
5    numbers?
6    A   No.  I've had business -- I have had business
7    phone numbers.
8    Q   You don't have one presently, but you have in
9    the past?
10   A   Correct.
11   Q   Okay.  And so what's the last business
12   telephone number you had?
13   A   615-727-8846, and I think it was 8845 was the
14   other one.
15   Q   Who were the service providers for those
16   numbers?
17   A   It's a company called Ooma, O-O-M-A.
18   Q   And when is the last time you had those
19   numbers?
20   A   I pretty much used them when I was using the
21   money service business and stopped using them after
22   that.
23   Q   Okay.  And the three cellphone numbers that
24   you presently have, are there any difference in purposes
25   for those different numbers?

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 45

1     A   No.  They are just personal cellphones that I
2   have.
3     Q   Okay.  And why three numbers?
4     A   Well, I bought three cellphones.
5     Q   Okay.  Why three cellphones?
6     A   Why?  Because I bought them.  I don't think
7   you can share a number across cellphones.  I don't think
8   that's possible.
9     Q   But what -- what need do you have for three
10   cellphone numbers?
11     A   I didn't know I needed one.
12     Q   Okay.  So there is no reason at all why you
13   got three different cellphone numbers?
14     A   I mean, it's not required to have a certain
15   number of cellphone numbers or --
16     Q   I'm just --
17     A   -- not required.
18     Q   No, that is absolutely correct.  I'm just
19   asking why you have three different cellphone numbers?
20     A   I bought them.
21     Q   All right.
22     A   It's -- you know, it's helpful to have a
23   backup times.  Sometimes if I'm driving, for example,
24   it's -- you know, if I'm talking on one, it's easy to
25   navigate with another one.

Page 46

1     Q   Any other reason?
2     A   I just -- I mean, a Boy Scout is always
3   prepared, and I was a Boy Scout, for the record.
4     Q   Just a Boy Scout, or did you get to be an
5   Eagle Scout?
6     A   No, I didn't.  I didn't.  I got into football
7   and kind of focused on just playing football.  So --
8     Q   What position?
9     A   Guard and tackle.
10     Q   Okay.  Was that at the military academy?
11     A   It was, yes.
12         Yeah.  I mean, it's just -- you know, I
13   don't -- I think for general life purposes now it's
14   pretty helpful.  I mean, just when I came over for the
15   deposition, I navigated using Uber.  That's how I got to
16   the hotel last night, with Uber.  To remember the
17   address of the place, I use my e-mail account to look up
18   the deposition notice and where to go.
19         If the cellphone is broken, battery died,
20   whatever, got flushed down the toilet, it's just handy
21   to have another one.
22         I mean, I look at it the same way as guns.  I
23   have multiple handguns.  I have more than two handguns.
24   I only have two hands.  I couldn't possibly shoot them
25   at the same time.  But I have more than two.  It's

Page 47

1   just -- it's just nice to have.
2         One's in the car.  Maybe one's in the house.
3   Maybe one's somewhere else.  Maybe I'm carrying one.
4   It's nice to have more than one.
5     Q   So let's talk about the cellphone, back to the
6   cellphones.
7     A   Okay.
8     Q   What are the present models of the cellphones
9   that you have?
10     A   Two are Pixel 3s.  And one is a Moto -- is a
11   Moto X or Moto G.  I can't remember.
12     Q   Do you have them with you?
13     A   Yes.
14     Q   Would you take a look at them?
15     A   I'm not going to tell the model from looking
16   at them.  I know -- like I said two, I know two are
17   Pixel 3s because I just -- those are recent ones.
18     Q   And who is the manufacturer for the Pixel 3?
19     A   Google, I believe.
20     Q   And the Moto?
21     A   It's a Moto X or Moto G.
22     Q   Is that Motorola?
23     A   Motorola, yes.
24     Q   Do you maintain e-mail accounts?
25     A   Yes.

Page 48

1     Q   Okay.  And how many different accounts do you
2   presently have?
3     A   Several.  Probably more than five.  I haven't
4   really counted.
5     Q   Do you actively use all five?
6     A   Yeah.  From time to time I keep track of them,
7   most of them.
8     Q   And what are the e-mail addresses for those
9   accounts?
10     A   Projectpalehorse@hushmail.com.
11     Q   Project?
12     A   Yes.  Pale, P-A-L-E, horse, HORSE,
13   @hushmail.com.
14     Q   Okay.  Is there a particular reason that you
15   use that account for?
16     A   Usually for communicating with attorneys.
17     Q   Okay.  So the projectpalehorse, that's a
18   separate e-mail account you maintain for primarily
19   communicating with attorneys?
20     A   Yes.
21     Q   And then who is the service provider?
22     A   Hushmail.
23     Q   What's next e-mail address that you use?
24     A   Bigcraig79@gmail.com.
25     Q   Okay.  What's the next e-mail address that you

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 49

1  use?
2      A   Craig.cunningham1980@gmail.com.
3      Q   Next?
4      A   Bigcraig79@hotmail.  I don't use that one
5  quite as much anymore.
6      Q   Next?
7      A   Newcountryllc@gmail.com.
8      Q   At where?
9      A   Gmail.
10     Q   Any others?
11     A   That's all I can remember right now.
12     Q   And so the bigcraig75 --
13     A   79.
14     Q   -- 79@gmail.com, what do you use that e-mail
15  account for?
16     A   It's just whatever, you know, general e-mail.
17     Q   Okay.  So general.  How about
18  craig.cunningham1980?
19     A   Sometimes telemarketers want an e-mail, so
20  I'll use that one more for that.
21     Q   Okay.  Do you buy a lot of products and
22  services through telemarketers?
23     A   I wouldn't say a lot, but sometimes.  Or if
24  they want to have an e-mail address or I want them to
25  e-mail me or whatever.  If they -- that's the one I use.

Page 50

1      Q   Okay.  How about bigcraig79?
2      A   That was -- at Hotmail?
3      Q   Yeah.
4      A   Yeah.  That was my first one, and like I said,
5  I don't really use that much anymore.
6      Q   And then what about newcountryllc?
7      A   It's more of a business focused one.
8      Q   Do you have a business called New Country,
9  LLC?
10     A   I do.
11     Q   What does that do?
12     A   It was more of a holding company for stocks
13  and so forth.  Oh, and there is also
14  graniteenterprisesllc@gmail.com.
15     Q   And what -- is that also a business?
16     A   Yes.
17     Q   What kind of business is that?
18     A   That's the Amazon business.
19     Q   Okay.  Now, who is your internet service
20  provider?
21     A   I believe it's Comcast.
22     Q   And for how long have you had Comcast?
23     A   Several years now.
24     Q   Do you use any other internet service
25  providers?

Page 51

1      A   Nope.
2      Q   Do you presently have health insurance?
3      A   Not that I know of.  Certainly not that I'm
4  using other than the VA.
5      Q   So the VA provides your health coverage?
6      A   They do.  It's great.
7      Q   Good to hear.
8          And is that coverage for your whole family?
9      A   No, just covers me.
10     Q   Are you married?
11     A   Yes.
12     Q   So your wife's not covered under the VA plan?
13     A   No, she would not be.
14     Q   Okay.
15     A   She's not a veteran.
16     Q   Does she have her own coverage?
17     A   She does.
18     Q   Through who?
19     A   Somebody.  I don't -- she set it up.  I don't
20  know.
21     Q   She set that up on her own?
22     A   Yeah.
23     Q   Okay.  And what's her name?
24     A   Maricel Forteza.
25     Q   In what state do you presently maintain a

Page 52

1  driver's license?
2      A   Tennessee.
3      Q   Any others?
4      A   I don't think you can have more than one
5  driver's license at the same time.
6      Q   Have you ever had a Texas driver's license?
7      A   Some years past, yes.
8      Q   So if I recall correctly, you've been living
9  in Texas since 2017?
10     A   Correct.
11     Q   But you still have your Tennessee driver's
12  license?
13     A   Correct.
14     Q   Is there a reason why you haven't changed your
15  driver's license?
16     A   Still maintain a residence -- or an address in
17  Tennessee.
18     Q   What address is that?
19     A   5543 Edmondson Pike, Suite 248, Nashville,
20  Tennessee 37211.
21     Q   That's a mailing address?
22     A   Yeah.
23     Q   That's not a living -- that's not a place
24  where you reside; correct?
25     A   Excellent job stating the obvious.

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 53

1    Q   Okay.  Just wanted to make sure.
2        So the reason you haven't switched over your
3    driver's license and the reason you still have a
4    Tennessee driver's license is that even though you
5    reside in Texas is that you maintain a mailing address
6    there?
7    A   Correct.
8    Q   All right.  Any other reason?
9    A   That's my testimony.  I can repeat it two or
10   three times if it needs to sink in.
11   Q   Well, thank you.  I thank you for bearing with
12   me, Mr. Cunningham.
13   A   I'll be here all day.
14   Q   So prior to this deposition, when is the last
15   time that you gave a deposition?
16   A   Maybe a week ago.  Sometime within the last
17   seven to ten days, I think.
18   Q   Was that in a TCPA case?
19   A   It was.
20   Q   And where is that case pending?
21   A   Eastern District of Texas.
22   Q   And who are your attorneys in that case?
23   A   I'm handling it myself pro se.
24   Q   Who are the attorneys that took the
25   deposition?

Page 54

1    A   I can't think of the guy's name.
2    Q   And the -- in that case, who is the defendant
3    that you're suing?
4    A   CBC Conglomerate and USFFC.
5        THE REPORTER:  What?
6        THE WITNESS:  FFC, Foxtrot, Foxtrot, Charlie.
7    BY MR. O'DONNELL:
8    Q   And where was the deposition taken,
9    Mr. Cunningham?
10   A   In Dallas, Texas.
11   Q   And then before the Dallas, Texas, deposition
12   when was the last one that you sat for?
13   A   Maybe sometime in January.
14   Q   And where was that located?
15   A   As I recall, it was the California one.
16   Q   And what district in California?
17   A   Somewhere between Seattle or Oregon and
18   Mexico.  I don't recall the exact district.
19   Q   What city were you in January?
20   A   I don't go to California very much.  It was a
21   deposition, in and out, one day.
22   Q   Okay.  Was it Southern California, Central,
23   Northern?
24   A   I'm not sure, you know.  If you want to look
25   in PACER, you can check out which cases are filed in

Page 55

1    California in January.
2    Q   Is that a case that you were represented by
3    counsel?
4    A   I was.
5    Q   And what lawyers represent you that case?
6    A   Jon Fougner.
7    Q   Can you spell that, please?
8    A   J-O-N, F-O-U-G-N-E-R.
9    Q   And who is the defendant in that case?
10   A   I think it was Performance SLC.
11   Q   Do you recall their lawyers?
12   A   No.
13   Q   And so before the January 2019, deposition
14   what was the prior deposition you sat for?
15   A   There was one at some point in Madison,
16   Wisconsin.
17   Q   In 2018?
18   A   It was in '18 or '19.  I can't remember
19   exactly.
20   Q   And so in the last five years, about how many
21   depositions would you estimate you have sat for?
22   A   I wouldn't estimate.  I haven't counted.  More
23   than five probably.
24   Q   Were they all TCPA cases?
25   A   I'm not sure.  Some of them were -- some of

Page 56

1    them probably weren't.  I don't -- you know, I would
2    have to go back and look at each and every case.
3    Q   Okay.  What other type of cases do you have
4    pending?
5    A   Now?
6    Q   Yes, or whenever these depositions were taken?
7    A   Oh, I've had civil rights cases.  I've had
8    FDCPA cases, contract stuff, business disputes, just,
9    you know.
10   Q   Okay.
11   A   A variety of litigation.
12   Q   So in the last five years for TCPA cases,
13   about how many depositions?
14   A   Again, more than five.  I don't recall
15   specifics.
16   Q   So can you describe for me the nature of your
17   claim against Health Insurance Innovations in this case?
18   A   I mean, I would refer you back to the
19   complaint.  But, generally speaking, it relates to
20   illegal telemarketing by or on behalf of Health
21   Insurance Innovations.
22   Q   Okay.  And do you have a list of those calls?
23   A   I've compiled a list of some of the calls
24   through about, I want to say, middle to end of 2017, I
25   think.  But I do not have an exhaustive list of the

14 (Pages 53 to 56)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 57

1    calls yet, and it's kind of a moving target because they
2    keep calling.
3        Q   So what number are these calls being received
4    on?
5        A   All of my cellphone numbers.
6        Q   All three that you gave me?
7        A   Yeah.  Again, to add to that, it's sometimes a
8    little bit difficult because they don't identify
9    themselves, as they are required to under the TCPA.
10   They lie about who they are.  They use spoof caller IDs
11   and so forth and basically go through a variety of
12   tactics to conceal their true identity, but usually I
13   can figure it out.
14       Q   Okay.  And how would I know which calls that
15   you are claiming that are offensive to you?
16       A   All of them are offensive to me.
17       Q   Well, let's start with the first one.  How
18   would I know when the call was made and what number it
19   was made from?
20       A   Well, you can ask your client, or you could
21   look at the list I made.
22       Q   Okay.  And is that the list that's attached to
23   the complaint?
24       A   There was that.  I believe we sent some over
25   in discovery as well.

Page 58

1        Q   Okay.  Is there another list?
2            MS. KUBERKA:  The one that was attached to the
3    complaint.
4            MR. O'DONNELL:  Okay.
5            MS. KUBERKA:  But as my client mentioned, it's
6    continuing so --
7            MR. O'DONNELL:  Correct.  Well, I can only --
8        A   I'll stop counting when they stop calling.
9            MR. O'DONNELL:  I can only ask him questions
10   about the information that's been provided so far.
11   So I guess that would be a good place to start with
12   Exhibit Number 1.
13           MS. KUBERKA:  Could we have a short break
14   before?
15           MR. O'DONNELL:  Absolutely.  Why don't we take
16   about 10 or 15 minutes.
17           MS. KUBERKA:  Perfect.
18           (Recess taken from 11:26 a.m. until
19   11:44 a.m.)
20   BY MR. O'DONNELL:
21       Q   So couple other questions, Mr. Cunningham, on
22   your TCPA cases.  When is the last one that you actually
23   settled?
24       A   I don't know.  I don't really keep track of
25   it.

Page 59

1        Q   Was it, like, last fall or early this year?
2        A   Might have been this year.
3        Q   Okay.  And what case was that that got
4    resolved?
5        A   I -- again, I don't really keep track of them
6    all or have a chronology of that.  I don't really care.
7        Q   Okay.  You can't remember the last TCPA matter
8    that you settled?
9        A   No.  I mean, if you check the court cases, it
10   may give some indication there.
11       Q   Yeah, I know.  I was just asking you the best
12   of your recollection.
13       A   Best of my recollection is that I don't
14   recall.
15       Q   Okay.  Was it a good settlement for you?
16       A   It's confidential, first of all, and -- and so
17   I wouldn't have settled if I wasn't -- the parties
18   weren't mutually satisfied with the outcome.
19       Q   Okay.  I mean, did you feel that you prevailed
20   on your point?
21       A   I don't know about that, but, you know, if it
22   settled, it settled.  It's confidential.  Settlement
23   negotiation is confidential, so --
24       Q   Yeah, I'm not asking you about the settlement
25   stuff.

Page 60

1        A   I'm just saying I wouldn't settle if I didn't
2    want to.
3        Q   Was it with an attorney?
4        A   I don't recall the specifics of the case.  I
5    have several going on right at the same time.  So.
6        Q   Okay.  So you just don't recall -- have any
7    recollection about the last case you settled?
8        A   I have cases.  Some settle; some don't.  The
9    main thing I recall is that they are confidential and --
10   you know.
11       Q   I'm just talking about the last one that you
12   settled.  Don't tell me anything confidential about it,
13   but do you recall the last case that you settled?
14       A   Like I said, not really.
15       Q   Name of it?  Nope?  Nothing?  Nope?
16       A   I've had settlements.  And like I said, I
17   have, you know, several.  Sometimes several happen at
18   once; sometimes it's a while.
19       Q   Okay.  Well, the last one that you had, was it
20   several at the same time or was that an individual
21   settlement?
22       A   I mean, usually, there's several defendants in
23   it, but it depends on each case.
24       Q   Okay.  So some cases you are settling with
25   certain defendants and not other defendants?

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 61

1     A   Could be.
2     Q   Okay.  Do you remember the last defendant
3  you've settled with?
4     A   Not really.
5     Q   No.  Okay.
6     A   Like I said, there -- some are in
7  negotiations.  Some are mediations.  Some are whatever.
8  It's just, you know -- we resolve them or we don't.
9     Q   Okay.
10    A   I wouldn't do it if I didn't want to.
11    Q   Okay.  Now, by way of background, the lawsuit
12 that brings us here today you originally filed in
13 Tennessee; correct?
14    A   Yes.
15    Q   Pro se?
16    A   Yes.
17    Q   And then you dismissed that case; correct?
18    A   Nonsuited it.
19    Q   Nonsuited it.  Right.
20        And then it was refiled in Chicago?
21    A   Correct.
22    Q   And then you had an attorney in Chicago?
23    A   Yes.
24    Q   Is that the Todd Friedman firm?
25    A   That is the Todd Friedman firm.

Page 62

1     Q   Okay.  So then in Chicago Health Insurance
2  Innovations -- you can keep one of those.  Go ahead.
3  Put it away.
4     A   It's a souvenir.  This is great.
5     Q   Yeah.  I told them to get more of those.
6  Branded stuff is good.
7     A   Yeah.
8     Q   So then the claims against Health Insurance
9  Innovations, Inc., in Chicago were dismissed.  Do you
10 recall that?
11    A   Yes.  I thought they were transferred to
12 Florida, but whatever.
13    Q   Okay.  And so then the case was refiled in
14 Florida against Health Insurance Innovations, Inc.?
15    A   Yes.
16    Q   You refiled the case here.  And then you had
17 the rest of the case that was in Chicago transferred to
18 Tennessee?
19    A   Sure.
20    Q   Is that what you did?
21    A   Yeah.  That's what happened.
22    Q   Okay.  And the calls that you are suing on in
23 the Tennessee cases are the same calls you are suing on
24 in this case; correct?
25    A   Some of them.  It depends on the defendants

Page 63

1  and which calls and which policies and so forth.
2     Q   Okay.  Do you know that you gave the same
3  information to the lawyers in the Tennessee case as you
4  did to us in this case on the calls that you were suing
5  on and that it's the same identical information?
6     A   If you say so.
7     Q   I asked you if you knew that or not?
8     A   I'm just telling you I made a list of the
9  calls and sent off the relevant discoverable
10 information --
11    Q   Okay.
12    A   -- that I have.
13    Q   And I was just asking you whether you knew
14 that or not?
15    A   I mean, okay.  My lawyers are handling it, and
16 I'm not sure of every e-mail and every discussion they
17 have had with the attorneys.  There are various parties
18 in this litigation.
19    (Off-the-record discussion held.)
20    MS. KUBERKA:  While you're doing that, did we
21 get David's appearance on the record?
22    MR. O'DONNELL:  Um-hum.
23    MS. KUBERKA:  Okay.
24    MR. O'DONNELL:  Our court reporter took care
25 of that for us in the very beginning.

Page 64

1    MS. KUBERKA:  Thank you, Madam Court Reporter.
2    (Off-the-record discussion held.)
3    (Exhibit Number 1 marked for identification.)
4  BY MR. O'DONNELL:
5     Q   So, Mr. Cunningham, I've given you a copy of
6  your second amended complaint that you filed in this
7  case.
8     A   Okay.
9     Q   And it's marked as Defendant's Exhibit
10 Number 1.  Do you have it in front of you?
11    A   I do.
12    Q   So if you will turn to Exhibit A of the
13 complaint?
14    MS. KUBERKA:  Do you have a copy that I could
15 follow along?
16    MR. O'DONNELL:  We should.
17    MR. ABRAHAMY:  I have.  It doesn't have those
18 exhibits, though.
19    MR. O'DONNELL:  I don't think I have one
20 that's not marked up, which is -- maybe you can
21 share for a while.
22 BY MR. O'DONNELL:
23    Q   So is that the -- Exhibit A, is that the list
24 of calls you said that you prepared?
25    A   That's part of it, but I think there is a more

16 (Pages 61 to 64)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 65

1    extensive one in the discovery responses.
2         Q    Okay.  We'll get to that in a moment.
3         So this complaint concerns calls that were
4    made to number 615-348-1977; correct?
5         A    In part.  Yeah.
6         Q    Is there some other part?
7         A    I'm just saying I've gotten calls on other
8    numbers from -- by or on behalf of Health Insurance
9    Innovations.
10        Q    I'm talking about the case that brings us here
11   today.  If you look at Paragraph 9, second sentence,
12   "Plaintiff further alleges these employees were
13   instructed to call Plaintiff's cellular telephone number
14   ending in 1977."
15             Do you see that?
16        A    Yes.  Okay.  I mean, that's what the exhibit's
17   for and maybe the -- again, the calls up to a certain
18   point.
19        Q    Um-hum.
20        A    It's not exhaustive of all the calls.  Calls
21   still continue.
22        Q    And then the next paragraph, 10, says that the
23   telephone calls to that number are in excess of 116.
24             Do you see that?
25        A    Yes.

Page 66

1         Q    Okay.  And then it refers to Exhibit A, which
2    is the list; correct?
3         A    Yes.  That's the list at the time that -- you
4    know, before we had done more investigation and inquiry
5    into it.
6         Q    And if you look at Exhibit A, it has a "Date,"
7    a "Time," and a "Called From" column.
8             Do you see that?
9         A    Yes.
10        Q    And so the "Called From," those are the
11   numbers that you claim to have received calls from to
12   your 1977 number; correct?
13        A    That's the caller ID that showed.  Whoever
14   called, whatever number they are actually using is up in
15   the air.
16        Q    Okay.  So do you have any information as to
17   where any of these calls actually came from, who made
18   the calls?
19        A    Health Insurance Innovations, probably Paul
20   Maduno and his company GIP Technology, which they have
21   been known for years to be a haven for telemarketers and
22   people who have been making illegal telemarketing calls.
23        Q    Okay.  Well, let's take, for example, the
24   first call from 731-501-1075.
25        A    Okay.

Page 67

1         Q    Who exactly made that call?
2         A    Health Insurance Innovations.
3         Q    And how do you know that?
4         A    Because when they called, they are soliciting
5    a policy for Health Insurance Innovations.
6         Q    Who called?
7         A    We just went through this.
8         Q    No.  We are talking about Call Number 1?
9         A    Health Insurance Innovations for all of them.
10        Q    What was the name of person that you spoke to?
11        A    I don't recall.  It's on the call recordings
12   or the -- that's -- that's what I defer to as far as who
13   said what and when and what names they use and so forth.
14        Q    Do you know that there is no number that
15   Health Insurance Innovations has that matches up with
16   731-501-1075?
17        A    Is that a statement or a question?
18        Q    Question.
19        A    I don't know that, and I don't know that to be
20   the truth.
21        Q    Okay.  And do you know it not to be the truth?
22        A    Yeah.
23        Q    Okay.  Why?
24        A    Because it's on the list.  I've identified it
25   as being associated with Health Insurance Innovations.

Page 68

1         Q    Any other reasons?
2         A    I'm not sure what you mean.
3         Q    Okay.  So for Call Number 1, do you have the
4    recording of that call?
5         A    Whatever recordings, you know, I sent it,
6    turned over.
7         Q    So is the answer you don't know?
8         A    It's -- I would defer to the discovery
9    responses and report that was produced.
10        Q    You would?
11        A    Yeah.
12        Q    Okay.  Any other information you personally
13   have that you can give us here today?
14        A    No.  It's Health Insurance Innovations, like I
15   said.
16        Q    Have you ever researched that number,
17   731-501-1075, to try to find out who that number maybe
18   associated with?
19        A    I don't know that -- I've looked into some of
20   them.  I don't know that I've looked into that specific
21   number.
22        Q    Can you give me --
23        A    But I've looked into some of them.
24        Q    Can you give me any specific number on this
25   list that you did do that for?

17 (Pages 65 to 68)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 69

1      A   It might have been that 914 number, 246-3405.
2   Again, I --
3      Q   914 -- what number is that, sir?
4      A   246.
5      Q   What number of your calls?
6      A   If you look at, like, from Line 19 --
7      Q   Yes.
8      A   -- pretty much generally -- I mean, there is a
9   347, but generally 19 to 31, that number.
10     Q   Yes.
11     A   Again, I think.  I know I've looked into some
12  of them, and I came back to Paul Maduno, who, again, is
13  a known telemarketer.  He lies about everything.  His
14  job is to cover up for people that are going to do
15  large-scale illegal telemarketing.  That's what he does.
16     Q   Can you give me any other information to the
17  question I asked?
18     A   What was the question?
19     Q   Do you need me to repeat it?
20     A   Sure.
21     Q   Okay.
22     A   That's why I asked.
23     Q   Did you -- did you investigate any of the
24  numbers that are on the "Called From" list to determine
25  who those numbers are associated with?

Page 70

1      A   Absolutely.
2      Q   Okay.  And which ones?
3      A   I've investigated all of them.
4      Q   Okay.  All right.  For Call Number 1, what is
5   that number --
6      A   Health Insurance Innovations.
7      Q   So if we Google that number, you think it will
8   come up Health Insurance Innovations?
9      A   I didn't say that that's how I did my
10  investigation.  You do your investigation however you
11  want to.
12     Q   You did?
13     A   But my investigation, again, comes back to all
14  these numbers are associated, most likely, with Health
15  Insurance Innovations.
16     Q   So I just want to make sure I understand your
17  testimony correctly, Mr. Cunningham.
18         So Call Number 1, the 731-501-1075, it's your
19  testimony that you actually conducted an internet search
20  of that phone number?
21     A   I don't recall saying the word "internet
22  search."
23     Q   What type of search did you do?
24     A   I investigated it.  I looked into it.
25     Q   How?

Page 71

1      A   Talking to the people, getting a policy
2   issued.  Might have done a John Doe subpoena.  I can't
3   recall specifically for that number.  But, like I said,
4   I investigated it, did a reasonable inquiry
5   investigation into it.  Most of the time, it was through
6   ordering a policy, and they came back as Health
7   Insurance Innovations.
8      Q   Okay.  Health Insurance Innovations
9   facilitated the issuance of the policy?  Is that what
10  you're saying?
11     A   Yes.  As I understand it, they have a central
12  role in the issuing of these insurance policies.
13     Q   You received a welcome e-mail from Health
14  Insurance Innovations?
15     A   I've received several.
16     Q   Okay.  For insurance policies that you have
17  purchased?
18     A   Yes.  Either that or quotes.
19     Q   And for insurance that you didn't need because
20  you had VA insurance?
21     A   Correct.
22     Q   Okay.  And do you believe that that was honest
23  on your part?
24     A   I think it was an honest investigation,
25  absolutely.

Page 72

1      Q   To purchase a policy under false pretenses
2   that you needed insurance?
3      A   I didn't say that.  That's your testimony.
4      Q   Well, you already had insurance with the VA;
5   correct?
6      A   Yeah.
7      Q   So when you filled out an application for
8   insurance, that was false?  You didn't need insurance?
9      A   It's not a false -- again, that's two
10  questions in there.  If you want to ask one at a time,
11  that would be great.
12     Q   You filled out applications for insurance?
13     A   Yes.
14     Q   Saying you wanted to buy insurance?
15     A   Yes.
16     Q   But you had insurance?
17     A   Okay.  Master of the obvious, yes.
18     Q   All right.  Well, that's fine.  It may be
19  obvious to you, but I'm not at your level.  So I'm just
20  trying to understand your position, sir.
21     A   Okay.
22     Q   So let's go back to Telephone Number 1.
23     A   Okay.
24     Q   What employee of Health Insurance Innovations
25  did you speak with that used that number?

18 (Pages 69 to 72)

Page 73

1   A   Again, if you want to talk about specifics,
2   you got to listen to the call recordings.  I don't -- I
3   don't recall.  Your client may have call recordings, but
4   I know that they can identify those numbers and which
5   ones are associated or not associated with their
6   company.  I know they have done that.  I don't know if
7   you guys turned that over, but I know they've done it.
8   I know you can do it.  And so my call count at the time
9   was pretty close to what they were -- had identified.
10   Q   Okay.  So do you have any specific information
11   that you can give us other than you have just testified
12   to that would support your claim that this 731-501-1075
13   is a telephone number associated with Health Insurance
14   Innovations?
15   A   Yeah, there is recordings, there is policies,
16   there is evidence of the calls during -- you know, going
17   back and subpoenaing the phone records and seeing who
18   was the carrier, that is probably going to come back
19   to -- might come back to Simple Health Plans.  You might
20   have heard about them.  I think they have been in the
21   news a little bit lately.
22   Q   Okay.  But my question is directed to
23   Number 1.  Can you tell me the person at Health
24   Insurance Innovations that you talked to that used this
25   number?

Page 74

1   A   Well, often these people use fake names, lie
2   about everything when they -- and answer it as -- like I
3   said, they would never identify themselves properly
4   under the TCPA, as they are required to.  People who are
5   breaking the law tend to not want to make it easily
6   identifiable and known who they are.  So it's like
7   asking a masked man who he is.
8   Q   Okay.  Is it your testimony that the person
9   involved with Call Number 1 on your list used a fake
10   name?
11   A   Probably, yeah.
12   Q   What fake name did that person use?
13   A   Again, you would have to listen to the call if
14   you want specifics about who said what and when.  I
15   don't recall.
16   Q   If I understand your testimony, you can't give
17   me any specifics; I have to look at something else?
18   A   You have to look at the evidence that's been
19   produced.  Yes.
20   Q   Fair enough.
21   A   I don't recall from two or three years ago the
22   specifics of a hundred-and-some-odd phone calls out of
23   350 or 400 calls that Health Insurance Innovations has
24   made to me.
25   Q   Okay.

Page 75

1   A   I'm sorry.  My memory is just not that good to
2   pinpoint specifics on a call two-and-a-half, three years
3   ago.
4   Q   You do understand that your deposition was
5   noticed over a month ago?
6   A   Okay.
7   Q   Okay.  And that you were to be here today to
8   talk about the factual basis underlying your claims
9   against my client Health Insurance Innovations?
10   A   There is still hundreds and hundreds of phone
11   calls that Health Insurance Innovations has placed to
12   me.  And that's just out of -- I get health insurance
13   calls from other people too.  So --
14   Q   So you did understand why you were to appear
15   here today to testify?
16   A   It's not my first deposition, as I've
17   testified before.  I'm -- it's still going to come back
18   to the issue that it's two, two-and-a-half years ago.
19   And there is hundreds and hundreds of phone calls, and,
20   you know, the -- many of the calls are recorded.  And
21   whatever the recordings say, they speak for themselves.
22   I'll defer to those if you want more specifics.  That's
23   been provided.
24       I'm sure Health Insurance Innovations has
25   their call recordings and their information.  And, you

Page 76

1   know, that's the best way, if you want to refresh my
2   memory, I'm happy to -- we can start at Call 1 and start
3   listening to call recordings.
4   Q   Okay.  If I ask you these same questions about
5   each one of the 116 lines, would you -- of telephone
6   calls, would your testimony essentially be the same?
7   A   No.  You are going to have to ask me for each
8   and every one.
9   Q   Okay.  Let's go to Number 2.
10   A   Okay.
11   Q   Who did you speak to when you received that
12   call from 954-800-4962?
13   A   Somebody -- an agent calling by or behalf of
14   Health Insurance Innovations.
15   Q   Who?
16   A   An agent calling either by or on behalf of
17   Health Insurance Innovations.
18   Q   Okay.
19   A   Calling from or on behalf of Health Insurance
20   Innovations.
21   Q   And who was that agent?
22   A   I don't recall their specific name or know
23   that, even if they gave me a name, that it would be a
24   real one.
25   Q   And when you say "agent," you are talking

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                          6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 77

1   about a licensed agent to sell health insurance?
2       A   Not necessarily.  I don't -- honestly, I think
3   most of the people I spoke with were not licensed health
4   insurance agents.  It would often -- one of the terms is
5   that the people I spoke with were almost never the
6   actual agent whose name would be on the policy.  I don't
7   think I ever spoke with the actual agents on the policy.
8           It's one of the concerning things as far as
9   insurance fraud and who -- what entities of people are
10  actually involved in this.  I don't -- I don't know that
11  I've ever spoken with a licensed health insurance agent.
12      Q   So did you do any research on whose number
13  954-800-4962 is associated?
14      A   Of course.  I wouldn't include it if I didn't.
15      Q   And what research did you do?
16      A   Again, same research, look up the number, talk
17  to the people, order a policy.  Again, possibly a John
18  Doe subpoena, see who the carrier is.
19      Q   So you ordered a policy as a result of this
20  call on August the 23rd, 2016.  Is that your sworn
21  testimony?
22      A   I don't know that specific call.  It might
23  have been the other one at 5:38 p.m.
24      Q   Well, what I'm talking about is Number 2
25  because --

Page 78

1       A   I get it.
2       Q   -- you said I had to go through each call
3   individually.  So that's what we need to do?
4       A   Sure.  Okay.  It's your deposition.
5       Q   So -- no, it's actually your deposition, sir?
6       A   Well, whatever.  I'm here for seven hours.
7       Q   I appreciate that.  And Number 2 is a call
8   that you said you received from 954-800-4962 at
9   5:21 p.m.  Did you take any notes of that call?
10      A   Probably not.
11      Q   Did you record the call?
12      A   Probably.  Almost certainly.
13      Q   Do you know for sure?
14      A   I would have -- again, you can look at the
15  call recordings and see if that number's there and the
16  time.
17      Q   Well, as you said, it's your deposition.  So
18  do you have a recording of that call or don't you?
19      A   Whatever I have has been turned over, I
20  believe.
21      Q   Okay.
22      A   Okay.
23      Q   We're going to get to that?
24      A   All right.  Can't wait.
25      Q   Okay.  So what was the name of the person that

Page 79

1   spoke to you?
2       A   It's on the recording.
3       Q   The name's on the recording?
4       A   If there is a recording, it's on the
5   recording.
6           MR. O'DONNELL:  Okay.  Let's take a
7   five-minute break.  Could you tell us what
8   recordings it's on, and then we'll just play it?
9   Can you do that for us?
10          MS. KUBERKA:  I can't.
11          MR. O'DONNELL:  Okay.
12          MS. KUBERKA:  Citrix blocks my access to the
13  system.  So --
14          MR. O'DONNELL:  Citrix?
15          MS. KUBERKA:  Your firewall is blocking my
16  access to Citrix.  So I can't access any of our
17  files currently.
18          MR. O'DONNELL:  All right.  So these are your
19  audio files.  Let the record reflect that I am
20  presenting to my opposing counsel a jump drive of
21  which we put all of the calls that were actually
22  placed to us so that she can load them up on her
23  computer and match up a phone call at 5-21 on
24  August 23rd, 2016, from number 954-800-4962.
25          Here you go.  It's right there.

Page 80

1           (Phone rings.)
2   BY MR. O'DONNELL:
3       Q   Looks like one of your three phones is
4   ringing?
5       A   Yeah.  It's not supposed to be doing that.
6           (Off-the-record discussion held.)
7           MS. KUBERKA:  Looks like my office may have
8   failed to provide a more specified list of the
9   identifying -- I see the issue that you are coming
10  into with these.  See how it doesn't list a
11  specific --
12          THE WITNESS:  That's caller ID, and that's the
13  time.
14          MS. KUBERKA:  Oh.  The time, do you have it --
15          THE WITNESS:  That's central time.  I think
16  that's central time as well.
17          MR. O'DONNELL:  Any luck?
18          MS. KUBERKA:  Looks like that caller ID is not
19  showing up a call recording.
20  BY MR. O'DONNELL:
21      Q   Okay.  All right.  Let's -- so it -- it -- if
22  I understand, Mr. Cunningham, what you're telling me
23  about your information about the list of these 116
24  calls, the detail of that information, if there is any
25  recording, it would have been provided by your lawyers

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 81

1   and whatever information there are about these
2   recordings are in the information provided by your
3   lawyers; correct?
4       A   Correct.
5       Q   Okay.
6       A   I'm not withholding any.
7       Q   Um-hum.
8       A   I can -- again, if you have specific questions
9   about a specific call, I can --
10      Q   I will.
11      A   Let me know, and I can see -- look again and
12  see if there is any other recordings of it, but --
13      Q   Okay.  And then if you look at Paragraph 22,
14  there is an allegation about a do-not-call list and an
15  e-mail that you said was forwarded to you from defendant
16  and/or defendant's agents.
17          Do you see where you said that?
18      A   Yes.
19      Q   Right there?
20      A   Yep.
21      Q   And that's exhibit B, which, if you turn to
22  Exhibit B, that's an e-mail from Health Insurance
23  Innovations compliance department to
24  montanamark13@yahoo.com; correct?
25      A   Yes.

Page 82

1       Q   Now, you actually spoke to this person on the
2   telephone; correct?
3       A   I did.  He was one of several of Health
4   Insurance Innovations's agents that called me after --
5   he said, "Well, we know we were told not to call you,
6   but we are going to do it any way."
7       Q   And his name was Mark Grabowski?
8       A   That's what he said.
9       Q   Okay.  And you provided a recording of a
10  telephone call with him; correct?
11      A   Sure.
12      Q   And in the beginning of the telephone call, he
13  expressly told you he was not with Health Innovations
14  Insurance; correct?
15      A   No, that's not -- I don't -- I think you are
16  misstating testimony.
17      Q   We are going to play the recording, but he
18  expressly told you that he was not with Health
19  Innovations -- Health Insurance Innovations and that he
20  was with a different company, and he explained that to
21  you in great detail.  Do you recall?
22      A   As I recall, he said he was an agent or he has
23  the ability to sell Health Insurance Innovations
24  policies and even tried to sell me a policy later in the
25  call.

Page 83

1       Q   Well, you bought policies through Health
2   Insurance Innovations's portal; correct?
3       A   No, I disagree with that.  I bought policies
4   as a result of calls from Health Insurance Innovations's
5   employees or agents.
6       Q   Those policies were issued by companies other
7   than Health Insurance Innovations?
8       A   Yes.  I mean, there is other insurance
9   companies involved.
10      Q   Yeah.
11      A   I don't think Health Insurance Innovations is
12  actually issuing, underwriting, or selling the policies
13  themselves, strictly speaking.
14      Q   Got you.
15      A   They are a broker.  They are some sort of
16  agent in relationship between them and then the
17  insurance companies, and then the agents are selling the
18  policies.  I think that's kind of how it works.
19      Q   Okay.  And so --
20      A   But, I mean, specific to this e-mail, I mean,
21  it obviously shows that there's this Mark Grabowski guy,
22  and he was provided my number from Health Insurance
23  Innovations.  Again, just reading off of this.  There is
24  my number.  There is Health Insurance Innovations.  It's
25  from Health Insurance Innovations, and he called it, and

Page 84

1   I don't know -- I don't know that Health Insurance
2   Innovations is just randomly e-mailing every Tom, Dick,
3   and Harry out there saying, "Don't call 615-348-1977."
4   I don't know where Health Insurance Innovations, if he
5   was an agent or employee or some affiliation with Health
6   Insurance Innovations where they would even have his
7   e-mail and name and other information from.
8       Q   Might have been a former agent?
9       A   I'm not privy to his, you know, relationships
10  and when he's an agent, when he's a former agent, and
11  all that.
12      Q   Well, he explained that to you, didn't he?
13      A   I mean, he said whatever he said.  Like I
14  said, all I know is he got an e-mail.  I don't know why
15  Health Insurance Innovations would send former agents
16  or, again, noncurrent agents and employees e-mails that
17  I don't think they have any ability to police that.  I
18  don't think, you know, they have any control over
19  nonemployees and nonagents.  So I don't know why they
20  would even send him versus any other random person on
21  the internet or anywhere an e-mail.
22      Q   So did you ask -- actually call Health
23  Insurance Innovations and request to be put on a
24  do-not-call list?
25      A   I don't know.  Again, out of the hundreds and

21 (Pages 81 to 84)

Page 85

1  hundreds of phone calls, I can't recall the specifics of
2  each and every conversation. I did -- I did send them
3  an e-mail, though, and -- as I recall, and I think
4  getting sued once or twice or three times -- you know,
5  at some point you should probably have an idea that I
6  don't want to receive calls from you and you should --
7  you know, if a summons and complaint from federal court
8  isn't sufficient to be an indication that I don't want
9  to receive calls and should be put on your do-not-call
10  list, I don't know what -- I don't know what I'm
11  supposed to do beyond that.
12      (Off-the-record discussion held.)
13  BY MR. O'DONNELL:
14      Q   So on Paragraph 22 of Exhibit 1, which is the
15  complaint that you have in front of you, it says that
16  you "called Defendants to request Plaintiff's cellphone
17  number ending in 1977 be placed on Defendants' internal
18  Do-Not-Call List."
19      Do you see that?
20      A   Yes.
21      Q   And you did that; correct?
22      A   I believe so.
23      Q   Well, that's what's in your complaint. I
24  mean, is that true or not?
25      A   I think it is.

Page 86

1      Q   You think it is or it is?
2      A   Again, we can listen to calls, and I know I
3  sent an e-mail.
4      Q   Well, I'm just asking about Paragraph 22 in
5  the complaint that you filed in federal court in the
6  Middle District of Florida --
7      A   Okay.
8      Q   -- where you have said and you have sued
9  Health Insurance Innovations and you have alleged that
10  you requested that they put you on a do-not-call list?
11      A   Okay. The complaint speaks --
12      Q   Did you do that?
13      A   It speaks for itself.
14      Q   Well, I want to know your testimony. Is that
15  statement truthful or not?
16      A   I believe it is.
17      Q   Okay. So you did ask to be put on a
18  do-not-call list?
19      A   As I recall and sent an e-mail and I probably
20  talked to somebody -- I mean, I obviously talked to Mark
21  Grabowski.
22      Q   Do you have a copy of the e-mail that you
23  sent?
24      A   I have not been able to find that as of yet,
25  but --

Page 87

1      Q   So you can't find the e-mail?
2      A   That's what I just said. I don't -- again, I
3  don't think --
4      Q   Do you think maybe you didn't send it or you
5  sent it and lost it?
6      A   I sent it and lost it. Or, again, I can go
7  back and look, check every e-mail account, but --
8      Q   Well, we have --
9      A   I don't think Health Insurance Innovations --
10  again, I remember this time frame because I sent the
11  letter. And, again, it was maybe a day or two before
12  that. So I just thought it was odd that I would start
13  getting calls from just random agents, insurance agents
14  saying, "Hey, they told me not to call you. So I'm
15  calling you." And then Mark sent me the e-mail, and it
16  made more sense that that was obviously as a result of
17  the e-mail I had sent.
18      Q   Okay. So you're saying that you got calls
19  from people other than Mark Grabowski?
20      A   I did.
21      Q   Okay. And have you produced that information
22  to us?
23      A   I don't know that I saved those calls. It was
24  just -- again, I get random calls about stuff I don't
25  want and stuff that doesn't make sense all the time.

Page 88

1  I've gotten calls about transvaginal mesh surgeries, and
2  not only have I never had a transvaginal mesh surgery,
3  as a guy, that's not particularly applicable to me. But
4  whatever. I still get calls about it. So I get calls
5  from people that don't make sense all the time.
6      Q   So for the --
7      A   It is -- I'm saying it didn't make sense until
8  Mark Grabowski and I had an extended call and I had
9  already had several -- at least two or three of these
10  calls, which I kind of disregarded because, again, they
11  never said Health Insurance Innovations, whatever. And
12  then, like I said, when I had a little bit more time and
13  more extended call with Mark Grabowski, for somebody to
14  say, "Hey, somebody told me not to call you. What's
15  that about?"
16      I said, "I don't know. I don't know who you
17  are. I don't know why you are calling."
18      But like I said, it didn't click and really
19  make sense until Mark's call, which then I got it, and I
20  obviously saved that call, but the other calls just
21  wasn't -- it wasn't particularly memorable, and I didn't
22  think of a reason to save them at the time.
23      Q   The cellphone that you have for the 1977
24  number, how long have you had that cellphone?
25      A   Maybe two years. I had a different cellphone

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 89

1    device at the time.
2        Q    You had a different cellphone device at the
3    time. When you say "at the time," you are talking about
4    at the time of the calls that --
5        A    2016.
6        Q    -- that are related to the lawsuit that brings
7    us here today?
8        A    Most of the calls. I can't -- I don't exactly
9    remember when I switched from one to the other, but
10   certainly in 2016.
11       Q    Did you undertake any effort to preserve the
12   electronic information on the cellphone on which you
13   received Calls 1 through 116 on Exhibit A to your
14   complaint?
15       A    Of course. Like I've said, I've sent most of
16   those. The call with Mark Grabowski, as an example, was
17   in 2016. That I've sent the call recording. You have
18   the call recording. That's -- that's about it. That's
19   all there is as far as electronic --
20       Q    I'm talking about the cellphone that you had
21   in 2016 that internally has the electronic information
22   reflecting the calls that you've listed on Exhibit A,
23   the 116 calls.
24       A    Yes.
25       Q    Am I able to examine that phone today or that

Page 90

1    electronic information? Did you save it anywhere?
2        A    Yes.
3        Q    Where did you save it?
4        A    As I just stated, not only is that information
5    saved, it has been exported and sent to you and your
6    client as part of discovery. We've just talked about
7    it. You told me that you have a call recording with
8    Mark Grabowski. That is an example of the same exact
9    identical information that's on my cellphone. I didn't
10   modify it, alter it, or anything. I saved it. Then I
11   sent you guys a copy of it. The same thing you have is
12   the same thing I have on my phone. If you -- there is
13   no other exam -- there is nothing else to get. You have
14   the same information, the same data that I have. It's
15   on my phone. It's also in your inbox.
16       Q    What phone is it on?
17       A    It's a Motorola something, G or E.
18       Q    Where is that phone?
19       A    It's in Texas.
20       Q    Okay. So you still have the phone that has
21   the electronic information on it for Calls 1 through 116
22   that are listed on Exhibit A to your complaint?
23       A    Yes.
24       Q    All right. Thank you. And that's still
25   operational?

Page 91

1        A    The battery -- I've had some battery issues
2    with it.
3        Q    You haven't deleted anything off of it; right?
4        A    Again, I've preserved the information. I
5    exported the information. And I've sent the same
6    information that's on the phone in an unaltered,
7    unchanged state to you as part of discovery.
8        Q    And I would confirm that by looking at your
9    phone; right?
10       A    I don't know of any confirmation. It's a
11   complete phone call with Mark Grabowski.
12       Q    Right.
13       A    It starts at the beginning and ends. There's
14   a phone number. There is the caller ID and a date and
15   time and all that.
16       Q    I'm not talking about -- again, let's just
17   kind of go back and stay focused for a second.
18       A    Okay.
19       Q    I'm talking about the list of the 116 phone
20   calls that are in Exhibit A to your complaint.
21       A    Right. And I'm talking about the specific
22   one --
23       Q    Wait. Just let me finish, and I'll let you
24   finish.
25       A    Okay.

Page 92

1        Q    And you're saying that you have the physical
2    cellphone which received these calls?
3        A    I do have the physical cellphone which
4    received those calls.
5        Q    You don't have it here with you today?
6        A    I don't have it with me today.
7        Q    Correct. And that you have extrapolated
8    information from that phone, provided it to your
9    attorneys, who you believe have provided it to us?
10       A    Also correct.
11       Q    Okay. And so my only question is for one to
12   verify, in fact, that that extrapolation was properly
13   done and fully accurately done, you still have your
14   cellphone. So someone could confirm that?
15       A    Hypothetically, they could.
16       Q    Okay. That's what I was trying to get to.
17       A    Okay.
18       Q    And I would just ask that you keep, you know,
19   that cellphone safe.
20       A    It's in a safe place. I -- like I said, the
21   only issue, I'm just going to caveat it now, I've had
22   some battery issues. I've changed the battery, tried to
23   get a new one. I've had some issues charging it and
24   stuff like that. So that's one of the reasons why I've
25   made a point to export all the data so that it's in an

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 93

1  easily accessible and usable format so you can have it
2  and I don't have to come back later and say, "Well, you
3  know, my phone is acting up. I'm having a -- you know,
4  I got half of it or I got a third of it."
5  No. I did all that. It's just a real pain in
6  the rear, but just for you, I did all that. So it's --
7  it's accessible. It's available. And, again, it's --
8  that's why I did it. So it's available. I did this,
9  again, thinking ahead a long time ago that I want this
10  information, I know it's important, and to keep a record
11  of it.
12  Q  Well, thank you. We appreciate that.
13  Now, as far as exporting the data, did you use
14  any particular software?
15  A  Bluetooth.
16  Q  Okay. And what -- where did you export the
17  data to using blue tooth?
18  A  Google Drive. I think it's either that or
19  Dropbox. One of the cloud services.
20  Q  Did you extract all of the information through
21  Bluetooth onto a Google Drive?
22  A  I extracted it as it's held on the device in
23  the normal course of the app and the storage and all
24  that stuff. That's -- you have the same copy, same
25  thing that I would have or she has or you have.

Page 94

1  Q  Well, how were the 116 numbers picked out as
2  opposed to the other calls on your phone?
3  A  Oh, when they come in, I would listen to them.
4  If they were talking about health insurance and Health
5  Insurance Innovations and so forth or I attribute it to
6  them, then I would save them.
7  Q  Using Bluetooth?
8  A  No, no, no. Let me explain how the app works.
9  So I have an app that records calls.
10  Q  What is the --
11  A  Automatic Call Recorder.
12  Q  Okay. That's recording voice calls; correct?
13  A  Is there another type?
14  Q  Yes. Again, we are going to talk about the
15  recordings later.
16  A  Okay.
17  Q  What I'm talking about right now are the 116
18  calls on Exhibit A to your complaint.
19  A  Okay.
20  Q  That information.
21  A  Yeah.
22  Q  Okay. You have a cellphone that you don't use
23  anymore that's in your personal possession; correct?
24  A  Correct.
25  Q  And you use that cellphone to import data,

Page 95

1  which includes the numbers that are on this list that's
2  Exhibit A?
3  A  I'm not sure I would agree with your
4  characterization.
5  Q  Well, then please explain it so I understand
6  it.
7  A  As I said, I have a call recording app that
8  records calls, the voice of the calls, and it also
9  records the phone number, caller ID, and then -- of the
10  calling party, and then the date and time. And so if
11  there is a call -- and it's basically two folders.
12  There is like a -- a rolling inbox of I think 2- or 300
13  calls, and then there is a saved folder of calls that I
14  want to save. So if I attributed it to Health Insurance
15  Innovations, I would save that and move it from inbox to
16  the saved calls.
17  That's why I said previously, with the random
18  insurance agents calling me, I didn't save those because
19  I didn't really attribute that to Health Insurance
20  Innovations or know who they were or why they were
21  calling until Mark and I had an extended conversation,
22  and it was, "Oh, okay, I'm with Health Insurance
23  Innovations." That's when I attributed it to Health
24  Insurance Innovations. He sent me the e-mail and so
25  forth.

Page 96

1  But beyond that I didn't save those calls
2  because I didn't really attribute it to this lawsuit. I
3  didn't think about it. I just didn't think it was
4  relevant and didn't know that it was.
5  Q  What's the name of the app?
6  A  Automatic Call Recorder.
7  Q  And so if I understand the process correctly,
8  you're not using that app to automatically save or
9  preserve telephone numbers on your cellphone. The app
10  only works when you designate a certain call to be
11  saved?
12  A  No. In the description of the app, which,
13  again, we are going to talk a little bit about obvious
14  things, but it automatically records calls without any
15  other intervention. That's the automatic part of it.
16  So as it automatically records calls, I have a call
17  recording on the app, on my cellphone when it's done.
18  Now, there is two folders that it goes into.
19  Really one folder it goes to. It goes into inbox
20  folder, which there is -- I think there is a maximum of
21  200 calls. So when I get 201 calls, the 200th -- the
22  current 200th call, when I get another call, that 200th
23  call is deleted off the app. Because it's kind of like
24  a flash memory.
25  I hope I'm not getting too technical. But

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 97

1    it's kind of like flash memory, which only holds a
2    certain amount of data.  And then, you know, if you turn
3    your computer off, that's gone.  But if you save it to
4    your hard drive, that's saved and preserved forever.  So
5    that's kind of how computers used to work a long time
6    ago.  But do you understand the analogy?
7        Q    Um-hum.
8        A    Okay.  Good.
9        Q    Yes.
10       A    So when it's in the inbox, I have the option
11   to save and move it to the hard drive, if you would, for
12   the permanent saved storage.  So for those calls, I
13   would -- I would do that, and, you know, if identified it
14   as being associated with Health Insurance Innovations.
15   If it wasn't and I didn't identify it as being
16   associated with Health Insurance Innovations at the
17   time, for example, if I have random health -- random
18   insurance agents calling me saying, "Hey, somebody told
19   me not to call you," and I don't know who they are and
20   why they are calling, I really didn't have a reason to
21   save that call.  I didn't -- I didn't know at the time.
22            But for calls with prerecorded messages or
23   that are initiated using automated telephone dialing
24   system that are obviously violative of the TCPA, I saved
25   those calls.  When they are talking about health

Page 98

1    insurance and I identify it as being associated with
2    Health Insurance Innovations, I can look and say, okay,
3    these are all the times this caller ID called.  I may
4    have only made that connection on the third or fourth
5    call, but then I go back and look or I can look through
6    my phone records and see that, oh, that caller ID called
7    me ten times in the last two weeks.  And so that's kind
8    of how you can research and look at and identify the
9    calls.
10       Q    All right.  So all the original data, though,
11   is on your cellphone?
12       A    Yes.  And all the copied data is in your
13   possession.
14       Q    Great.  All the copied electronic data?
15       A    Yeah, I'm not sure what --
16            MR. O'DONNELL:  Did we get any -- did we get
17   an electronic file of the calls that he saved, not
18   the recordings?
19            MS. KUBERKA:  He's talking about the
20   recordings.
21       A    Yeah.
22   BY MR. O'DONNELL:
23       Q    Oh, I'm talking the telephone calls that are
24   on Exhibit A.
25       A    I'm not sure what the difference is.

Page 99

1        Q    Okay.  How did you make the list?
2        A    I just went through that.  You really want me
3    to talk about that again?
4        Q    Just for the record, we don't have 116
5    recordings.
6        A    And there may not be 116 recordings.
7            MS. KUBERKA:  It doesn't mean that call didn't
8    happen.
9    BY MR. O'DONNELL:
10       Q    Okay.  So where do we find the electronic
11   footprint of the call happening?
12       A    Talk to your friends at the Simple Health
13   Plans and some of the illegal telemarketers that you
14   guys have been using.
15       Q    I want to make sure that you don't have it.
16       A    I didn't make the calls to myself.  How would
17   I have that?
18       Q    They were received by you?
19       A    They were received by me.
20       Q    Okay.
21       A    Okay.
22       Q    Where is that information?
23       A    What information?  You got to be a little
24   more -- you have a list of the phone calls.
25       Q    Um-hum.

Page 100

1        A    You have --
2        Q    How was the list made?
3        A    I just talked about that.  But I'll do it
4    again.  Here we go.  Okay.
5        Q    Let's break it down for listed telephone calls
6    versus the recordings.  Keep the recordings separate.  I
7    want to know how you made this list of calls.
8        A    Okay.  I would get a call.
9        Q    Correct.
10       A    It would be usually initiated using a dialing
11   system.  Often there were prerecorded messages.  I know
12   that that's -- I didn't ask about health insurance.  I
13   don't need health insurance.  I have Veterans
14   Administration.  They are great.  Whatever they are
15   charging for this crap health insurance, the VA is free,
16   and you can't beat free unless they are going to pay me
17   to go to the doctor, which the VA actually has.  They
18   pay mileage if you have to travel a certain distance.
19   So I've gone to the doctor for free and gotten paid cash
20   money for going to the doctor.
21            But I digress.  At any rate, that list is made
22   when I get a -- what appears to be an unsolicited,
23   unwelcome, violating telephone call automated or
24   prerecord or both to my cellphone.  I identify that
25   because I have ears and I know what an automated call

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 101

1  sounds like or a prerecorded message sounds like and I
2  can generally listen to what a pre -- automated call
3  characteristics of in ATDS.
4        So when I hear that, I -- my Automatic Call
5  Recorder automatically, just like it says in the title
6  of the app, records the call.  So if it's an automatic
7  recording of the call, that lists the caller ID, the
8  time, the date, and then I move that from inbox to the
9  saved permanent folder of calls.
10       So I already have the same information that's
11  on that list, I have the caller ID -- let's look at
12  this.  Hold on.  Yep.  There it is.  "Call From" which
13  is the caller ID of the number to me -- we already
14  talked about this -- to 1977.  So it's from -- to 1977
15  from, looking at Line 1, 731-501-1075.  The time
16  approximately 1:53 central time, 8-23-2016.
17       Q   Okay.  Now --
18       A   So that's how this list is made because I have
19  identified an illegal telemarketing call that involves
20  Health Insurance Innovations.
21       Q   Okay.
22       A   So I got date.  I got the time.  I got the
23  caller ID.  Do you understand?
24       Q   I'm trying.
25       A   That's number one.  Then hold on.  Then I get

Page 102

1  a call from 954-800-4962 automated or prerecorded to my
2  cellphone 1 -- 1977 at 5:21 in the p.m. on August 23rd,
3  2016.  Same prerecorded message, as I recall, that the
4  other call had.
5       Q   So this list that's Exhibit A, did you
6  manually prepare this or was this typed off of a --
7  created on an app?  Who prepared Exhibit A?
8       MS. KUBERKA:  I did.
9  BY MR. O'DONNELL:
10      Q   Okay.
11      A   My lawyer did.
12      Q   What was used to prepare Exhibit A?
13      A   I think a computer.
14      Q   So is there electronic data to support
15  Exhibit A?
16      A   Sure, there is.  I'm sure there -- yeah.  I'm
17  sure it's --
18      Q   Not been produced.
19      A   You have call recordings.
20      Q   We have call recordings.
21      A   There is call records from my cellphone
22  carrier.
23      Q   We have paper records.
24      MS. KUBERKA:  Yes.
25      A   Okay.

Page 103

1  BY MR. O'DONNELL:
2       Q   We don't have the electronic base from which
3  this --
4       A   Well, you know, you can subpoena my carrier if
5  you think the call records or the call are not --
6       Q   I'm not asking for your -- your information.
7       A   I'm not the custodian of the records, and I
8  don't have the deep internals of the IP address that the
9  calls were from and to.  Look, I don't -- I don't get
10  into all that.  That is above my pay grade.  All I know
11  is my phone rings, and there is a phone number, and it's
12  at a certain time, and then I know the date.  I usually
13  keep track of the date pretty well.  So --
14      Q   So somewhere -- somewhere you have the
15  electronic support that underlies Exhibit A?
16      A   I'm not sure what you mean by "electronic
17  support."
18      Q   Well, these numbers came in to your cellphone;
19  right?
20      A   Yes.
21      Q   And then somehow you gave the electronic
22  information on your cellphone to your attorney?
23      A   I sent her the call recordings, which you guys
24  have a copy of.
25      Q   We only have the calls that are recorded, not

Page 104

1  all the calls that are on Exhibit A.  We are going
2  around and around about this.
3       A   Every call --
4       Q   Can you -- can you answer more specifically
5  the questions that I've asked.
6       A   Are you unclear about any element of how I
7  documented and did some of the investigation to
8  determine that 731 or 954 or any of these phone numbers
9  are associated with your client?
10      Q   I am asking for the underlying electronic
11  basis upon which this list is made.
12      A   I don't know what "underlying electronic
13  basis" means.
14      Q   One is on your cellphone, and then you've
15  extracted it somehow from your cellphone TO another
16  media.  Then, apparently, you gave it to your lawyer,
17  and your lawyers made this list?
18      A   And you have a copy of the call recordings.  I
19  don't know what -- you're asking for a specific question
20  to a very vague -- I've taken computer science courses,
21  and I don't know what the heck you are talking about
22  when you talk about electronic basis for the call
23  recordings.  They are on.  You have the call recordings.
24  Turned over the phone records from the phone company.
25      MS. KUBERKA:  They haven't subpoenaed those.

Electronically signed by Niki Noojin (501-395-5430)
Electronically signed by Niki Noojin (501-395-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 105

1     MR. O'DONNELL:  No, we haven't.
2     A   You haven't subpoenaed them?
3   BY MR. O'DONNELL:
4     Q   No, and it's not really something I'm
5   interested in.  I'm interested in the calls that you
6   received that brings you here today that support the
7   federal lawsuit that you filed.
8     A   Okay.
9     Q   Yeah.  So I'm trying to understand how
10  Exhibit A was created.  In the court system, if someone
11  gives you a summary, you are entitled to examine the
12  electronic information underlying the summary.  That's a
13  federal rule of evidence.  If you're unable to provide
14  that evidence, one, the case should have never been
15  filed and certainly should not go forward to trial.  So
16  in my inartful way, I'm trying to determine, one -- and
17  I think I've established this -- that you still have
18  your original cellphone on which these 163 -- 116 calls
19  were received.  Correct?  You still have the cellphone?
20    A   I do have the cellphone.  Yes.
21    Q   Then you have an app that you use to record
22  calls?
23    A   Correct.
24    Q   Okay.  And that you extracted some type of
25  electronic information to provide to your lawyer in this

Page 106

1   case.
2     A   What --
3     Q   Electronic information means there was no
4   paper information.  You extracted certain information
5   off of your phone.  I thought you told me you put it on
6   a Google Drive?
7     A   It was Google or Dropbox, one of them.
8     Q   Okay.
9     A   And there are -- that would be -- let me
10  clarify.  I'll be more specific.  The extracted
11  electronic information is the call recordings.  That's
12  what I'm referring to.  I don't know what other
13  electronic information an Automatic Call Recorder is
14  going to provide other than call recordings, which we
15  do have.  Every call recording is not on there, but I am
16  able to look through my -- you know, my carrier's phone
17  records and you would be able to do the same thing if
18  you contacted the custodian of records.
19    Q   So you have your carrier's phone records?
20    A   Yes, in an unsworn --
21    Q   And you've not produced them in this case?
22    THE WITNESS:  Have we?
23    MS. KUBERKA:  He has the list from the actual
24  device of the call logs.  It's not the same as the
25  carrier recordings that are more in-depth.

Page 107

1     A   I'm just -- yeah, have you not received
2   anything that looks like phone records from a phone
3   company or a spreadsheet or --
4   BY MR. O'DONNELL:
5     Q   We are going to go over all of that.
6     A   Well, let's talk about it now.  You keep
7   asking me about this list, Exhibit A.  That's what
8   Exhibit A was generated from.  So let's not talk about
9   it later.  You want to know where Exhibit A came from.
10  You talk about the federal rules of evidence and all
11  that stuff.
12    And you have -- the only electronic stuff are
13  call recordings, and beyond that and how the phone --
14  how the calls were transmitted and what cell to tower or
15  whatever, I don't know all that.  You have to ask
16  Republic Wireless, the custodian of records, how exactly
17  the calls were transmitted and how they spoofed -- I
18  don't know all that.
19    But all I know is my phone rang and the date
20  and time.  That date and time is reflected on here, and
21  the caller ID is reflected on here.  And the custodian
22  of records is Republic Wireless.  That's what I know.
23  And I look at my phone records and see how many times
24  these numbers call me.
25    Q   Okay.  Now, with respect to Exhibit B, on the

Page 108

1   complaint.
2     A   Okay.
3     Q   So the e-mail that you've provided us with is
4   an e-mail asking that your telephone number be placed on
5   an internal do-not-call list; correct?
6     A   Yes.
7     Q   And that was a request that you made; correct?
8     A   Yes.
9     Q   All right.  And then you said that you
10  received calls from more than montanamark, who is Mark
11  Grabowski?
12    A   Correct.
13    Q   Okay.  And who else did you receive calls
14  from?
15    A   Again, I don't remember their names.  I just
16  thought it was -- I just remember around that time frame
17  I started getting weird calls about, "Hey, somebody told
18  me not to call you.  Why is that?"  And, like, it was
19  just odd.  Again, just as I remember calls about
20  transvaginal mesh surgeries.  I don't have a vagina,
21  just for the record.  So I --
22    Q   But I'm talking about the calls that you got
23  regarding your number and request not [sic] to be placed
24  on a do-not-call list.  So let's confine it to that?
25    A   Okay.

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 109

1    Q   Now, did you keep a list of those calls?
2    A   Are you talking about from the random
3  insurance agents?
4    Q   Correct.
5    A   No.
6    Q   Those calls would still be on your cellphone
7  that you have?
8    A   Probably not.
9    Q   Why not?  They were around the same time.
10    A   Again, there is a list -- a limit of 200 calls
11  that are -- if they are not saved, they are in inbox.
12  Then it's a rolling 200 list.  So as more calls come in,
13  as another 200 calls come in, those previous 200 calls
14  are going to be purged.
15    Q   Did you make any effort to prevent those calls
16  from being purged?
17    A   I didn't know that I -- I didn't know
18  what they were -- I didn't know who was calling and what
19  it was about, as I just stated.
20    Q   You just explained what it was.
21    A   I explained after the fact that I figured out
22  that, yes, it was related to Health Insurance
23  Innovations, but I didn't -- I didn't know that at the
24  time.
25    Q   Okay.  Well, let's talk about Exhibit B and

Page 110

1  this e-mail.  And you received a call from Mark
2  Grabowski; correct?
3    A   Correct.
4    Q   And that's a recording that you provided to
5  us; right?
6    A   Correct.
7    Q   Let me start to play it, and I might stop it
8  now and then, and I might have a question.
9        MR. O'DONNELL:  If you have any problem
10  hearing it, let me know.  Okay.  And we'll have it
11  later if you need to listen to it.
12        (Recording played as follows:)
13        VOICE:  I'm not supposed to call that number,
14  but I did anyway.  Do you know what that's all
15  about?
16        MR. O'DONNELL:  Let me start this over again.
17        (Off-the-record discussion held.)
18        (Recording played as follows:)
19        VOICE:  Yeah, I got an e-mail that I'm not
20  supposed to call this number, but I did anyway.
21        (Recording stopped.)
22  BY MR. O'DONNELL:
23    Q   Now, it seems like there's something missing.
24  He says, "Yeah, I just -- you know, I got this e-mail,"
25  but I didn't hear you pick up and say "hello."  I didn't

Page 111

1  hear -- is there a part of this call that was not
2  recorded?
3    A   I don't think so.  I sent it as it's -- I sent
4  the whole recording that I have on my cellphone.
5    Q   Does it sound like the whole call wasn't
6  record to you?
7    A   No.  It sounds like everything.
8    Q   Okay.  Hold on.
9    A   You are not going to hear it ringing on my
10  end.  The only way you can tell --
11    Q   I didn't hear a "hello" from you?
12    A   Most of the time I don't say "hello."
13    Q   You don't say "hello."  You just picked up the
14  phone and somebody started talking?
15    A   That one I remember was in the morning.  I was
16  trying to sleep I think.  November 2nd.  I felt like
17  that was a Saturday -- I remember I was trying to sleep
18  in.
19    Q   Let's play it again.
20    A   Okay.
21        (Recording played as follows:)
22        VOICE:  Yeah, I got an e-mail that I'm not
23  supposed to call this number, but I did --
24        (Recording stopped.)
25  BY MR. O'DONNELL:

Page 112

1    Q   So does that sound like we don't have a full
2  recording of the call to you?
3    A   Whatever recording I have is the same
4  recording you have.
5    Q   Okay.
6    A   I didn't edit or modify -- the only
7  possibility is that -- because you can turn on and off
8  the automatic call recording setting.  I mean, the only
9  possibility is if I was -- if I had it on manual instead
10  of automatic and I was just a little slow hitting
11  record.  But like I said, generally speaking, I would
12  just have all calls recorded.  Like I said, I didn't
13  modify it.  If you want to listen to the cellphone or to
14  the call off of my cellphone, it's going to sound
15  exactly like that.  And I just -- I just hit forward and
16  send and sent whatever -- whatever's on the call as
17  it -- as it is.
18    Q   Okay.  My only point was not that there are
19  different recordings, but the recording doesn't start
20  with the beginning of the call.  That's all.
21    A   I can't -- I can't -- I can't -- I believe
22  that's the beginning of the call.  I can't say that it
23  wasn't, but there is a low, low -- low, low probability
24  that maybe I was a little slow.  But it's an automatic
25  call recording app.  I don't screw with the settings

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

## Page 113

1   that often. That's the only possible thing I can think

2   of, but I don't think that's likely.

3       (Recording played as follows:)

4       VOICE: -- anyway. Do you know what that's

5   all about.

6       MR. CUNNINGHAM: I don't know. Who are you?

7       VOICE: I work with Health Insurance -- it

8   says, "Health Insurance Innovations. Please add

9   this person to do-not-call list," and it says, "Do

10  not market, sell, even if inbound, to anyone using

11  this number."

12      So it sounds like this is just an individual

13  number, isn't it?

14      MR. CUNNINGHAM: Yeah. You said Health

15  Insurance Innovations sent that to you?

16      VOICE: (Indiscernible) Yeah. Health

17  Insurance Innovations. And then it said, "Thank

18  You, HLL [sic] Compliance Department." So I

19  thought I'm still going to call and find out why I

20  can't call that number. It's weird. I had no

21  idea.

22      It says, "Health Insurance Innovations, Please

23  add to DNC" -- "Dear Mark J, Please add the

24  following telephone number to your internal DNC

25  list, and please do not market or even sell, if

## Page 114

1   inbound, to anyone using this number." That just

2   seemed kind of odd to me.

3       MR. CUNNINGHAM: Did Health send those out to

4   you or tell you not to call people. I'm not sure.

5   It's -- I had never heard of this company, but it

6   sent me this.

7       (Recording stopped.)

8   BY MR. O'DONNELL:

9       Q   Did you hear him say he never heard of this

10  company?

11      A   Yeah.

12      Q   So does that indicate to you that he's not

13  involved with Health Insurance Innovations?

14      A   No.

15      Q   Okay. Let's play some more.

16      A   There is an e-mail from him, and he said

17  "Health Insurance Innovations."

18      Q   Correct. And he told you he wasn't with

19  Health Insurance Innovations?

20      A   He didn't say that.

21      Q   And later he tells you what company he

22  actually works with, doesn't he?

23      A   Just -- just because they are an

24  independent --

25      (Recording played as follows:)

## Page 115

1       VOICE: I just thought I'd give it a call and

2   let you know if either you requested or they are

3   sending it out on your behalf. Are you an

4   individual or just -- I know 615, isn't that

5   Tennessee?

6       MR. CUNNINGHAM: It is yep.

7       VOICE: Yeah. I used to work down in

8   Nashville, but just letting you know, I don't know

9   why I got this e-mail. But, I mean, so I'm just

10  letting you know it's got -- it's sending it out to

11  not call this person, this number, or if the number

12  comes in to us that we are not supposed to answer

13  it. And it says do not call list --

14  BY MR. O'DONNELL:

15      Q   I backed up a little bit so you can listen.

16      VOICE: It says, "Do not market sell, even if

17  inbound, to anyone using this number." So it

18  sounds like this is just an individual number,

19  isn't it?

20      MR. CUNNINGHAM: You said Health Insurance

21  Innovations sent that to you?

22      VOICE: (Indiscernible) Yeah, Health

23  Insurance Innovations. And then it says, "Thank

24  you HLL [sic] Compliance Department.

25      "So I thought I'm still going to call and find

## Page 116

1   out why I can't call that number. It's weird. I

2   have no idea.

3       It says, "Health Insurance Innovations, please

4   add to DNC" -- 'Mark J, Please add the following

5   telephone number to your internal DNC list, and

6   please do not market or even sell, if inbound, to

7   anyone using this number." That just seemed kind

8   of odd to me.

9       THE COURT: Did Health send those out to you

10  or tell you not to call people?

11      VOICE: I'm not sure. It's -- I had never

12  heard of this company, but it sent me this number,

13  and I just thought I would --

14      (Recording stopped.)

15  BY MR. O'DONNELL:

16      Q   And so it's still your testimony that Mark

17  Grabowski told you that he had some affiliation with

18  Health Insurance Innovations?

19      A   Yeah. He got an e-mail from Health Insurance

20  Innovations. You know, why he said what he said, you

21  would have to ask Mark Grabowski. Why Health Insurance

22  Innovations sent that e-mail to him, you would have to

23  ask your client.

24      All I can tell you is I don't think Health

25  Insurance Innovations is going to send e-mails to random

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                     6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 117

1    people telling me not to call them unless they are an
2    agent or affiliated with them somehow. I don't know how
3    Health Insurance Innovations would even have his name or
4    e-mail address to send him an e-mail to tell him not to
5    call me.
6         Q   So could you take a look at Paragraph 13 of
7    the complaint, please?
8         A   Yep.
9         Q   This is where you allege that a prerecorded
10   message was left for you; correct?
11        A   Correct.
12        Q   And apparently you have a recording of this
13   prerecorded message that you've provided to us?
14        A   Yes.
15        Q   Okay. It says, "Hi, my name is Michael and
16   I'm calling from the National Health Insurance
17   Enrollment Center"; correct?
18        A   That's what's on the paper.
19        Q   Doesn't say anything about Health Insurance
20   Innovations?
21        A   No, it doesn't.
22        Q   Now, did you return that call?
23        A   It doesn't list a date and time, but I may
24   have.
25        Q   Just don't recall?

Page 118

1         A   There were several calls and several versions
2    of their prerecorded messages that I've heard. That's
3    just one of them.
4         Q   So just so I'm clear about the Automatic Call
5    Recorder app that you have --
6         A   Okay.
7         Q   -- who offers that app?
8         A   It's on the Google app store.
9         Q   Okay. Is it a Google application, or is it --
10        A   It's not made by Google. It's a -- it's
11   somebody that makes apps.
12        Q   So this Automatic Call Recorder app, you leave
13   that on your cellphone 1977 on all the time?
14        A   Yes. It runs in the background almost all the
15   time.
16        Q   Okay. And the calls that bring us here today,
17   they are actually resident on another phone device
18   that's not here with you today; correct?
19        A   They are on the phone device. They are in her
20   inbox or a Google Drive or shared -- some sort of cloud
21   drive; and as I understand, you guys have access. So
22   you have a copy of it. She has a copy of it. I have a
23   copy of it.
24        Q   Okay. We'll get to that part.
25        A   Okay.

Page 119

1         Q   I just wanted to make sure I understood where
2    the device is.
3         A   Yep.
4         Q   Now that number, this 1977 number is -- you're
5    now using a different cellphone device for it?
6         A   Correct.
7         Q   Okay. And so the app that you have, Automatic
8    Call Recorder, that's going to record every call that
9    comes in to 1977?
10        A   It depends on the settings. It depends on the
11   settings.
12        Q   And who determines the settings?
13        A   I do.
14        Q   What settings are there?
15        A   I mean, you can record every call. You can
16   record every call except those that are from caller IDs
17   in your -- in your phone book; so, like, saved people.
18   You can record none of them. You can turn them off.
19   You can set it to manual versus automatic. There is
20   just various other settings.
21        Q   And then how do you ensure that you comply
22   with the laws of the various states for recording
23   telephone calls?
24        A   I comply with the various states relating to
25   recording telephone calls.

Page 120

1         Q   How do you do that?
2         A   I'm not sure what you're saying. I comply
3    with the laws. That's how I do it.
4         Q   Okay. How do you comply?
5         A   I don't do what's illegal, and I do what's
6    permitted.
7         Q   Are there states that are what are called
8    two-party consent states?
9         A   I've heard the term, yes.
10        Q   Versus one party consent states?
11        A   Sure.
12        Q   And when you have your cellphone, you travel
13   with it; right?
14        A   Generally, yes.
15        Q   To different states?
16        A   Yes.
17        Q   Okay. And you may be in states that have
18   two-party consent requirements when you received and
19   record telephone calls?
20        A   Rarely, but it's --
21        Q   Possible?
22        A   I've been in them. Rarely.
23        Q   Now, as far as the recording when it's -- I
24   don't know if I used the right word, not recording, but
25   as far as the storage capabilities, do you --

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 121

1        MR. O'DONNELL:  One second.
2        MR. ABRAHAMY:  All right.
3   BY MR. O'DONNELL:
4        Q   -- do you make any effort, you know, to get
5   additional storage so you can adequately preserve all
6   these various calls that are coming in and are related
7   to all of these different lawsuits or do you just rely
8   upon your settings and you extracting the information
9   that you want to extract?
10       A   I'm not sure what you mean.
11       Q   Do you undertake any effort to increase the
12  storage?  You mentioned one part of your testimony is
13  after 200 calls it starts to delete the older calls.
14  But do you make any efforts to make sure that you,
15  before that automatic deletion function is triggered
16  that you store the information?
17       A   Oh, generally, if I think it's an actionable
18  call, I save it.
19       Q   Okay.  But that's your determination that you
20  make?
21       A   That would be my determination.  I -- most
22  cellphones are limited as far as their storage
23  capabilities as far as their permanent storage
24  capabilities.  So I -- and every call is not actionable
25  or necessarily one that I think is a violation of law.

Page 122

1   So I'm not necessarily going to save every single call.
2        Q   But you're not saying that so somebody else
3   could maybe reach a different conclusion than you?
4        A   What do you mean?
5        Q   Well, you're making the decision on what
6   information you're saving and what you are not?
7        A   It's my phone, yes.
8        Q   Okay.
9        A   I don't know that there is anyone else that
10  would make that decision for me.
11       Q   Okay.  So the other agent calls that you got
12  about this do-not-call list, the other calls that you
13  received about the do-not-call list, where are the
14  recordings for those?
15       A   Like I said, I don't -- I didn't save them
16  because I didn't think I had to or think that it was --
17  know that it was even relevant.  I didn't know who the
18  people were calling.
19       Q   Well, you saved Mr. Grabowski's call?
20       A   Of course.  Because Mr. Grabowski talked about
21  Health Insurance Innovations and talked about an e-mail
22  and sent me a copy of the e-mail.  So preserving that,
23  knowing it's relevant to a current or future claim is --
24  is -- is relevant.  Obviously, I would have an
25  obligation to do that.  But I just can't save every

Page 123

1   crazy call that I get from random people I don't know
2   who they are or why they are calling or who they are
3   calling on behalf of.
4        If they had said Health Insurance Innovations,
5   I would have saved the call, but they didn't say that.
6   Mark Grabowski did say that.  So that's -- that's,
7   again, where the determination of I can't save every
8   call; otherwise, I'm going to have a phone with no
9   storage space and I'm going to have to get another
10  phone.
11       Q   But you are in the business of pursuing these
12  TCPA claims.  I mean, it's part of what you do.  Why
13  wouldn't you get the increased storage to preserve all
14  of this data?
15       A   Do you want to ask one question or three?
16       Q   Well, if there were three, you could pick
17  whichever one you want to answer?
18       A   It's not a business, and I'm not in that
19  business.  I don't know of anyone who has a business
20  like that.
21       Q   Okay.  Well, you've written books on it, a
22  book?
23       A   No.  I haven't.
24       Q   And you have blog sites where you are helping
25  people file these claims; right?

Page 124

1        A   I don't help people file any claims.  I don't
2   know what blog site you're referring to.
3        Q   Okay.  So do you have a -- one of the
4   cellphones that you have with you today is the 1977
5   number?
6        A   Correct.
7        Q   Okay.  And so if somebody called you here
8   today, it would be automatically recorded?
9        A   Depends on the settings.
10       Q   Okay.  Well, they are your settings.  Do you
11  have them on or off?
12       A   Right now my phone's off.  So I don't know.
13       Q   Okay.
14       MS. KUBERKA:  Want to take a break?
15       THE WITNESS:  Yeah, can we take probably about
16  a five-minute break.
17       (Off the record from 1:07 p.m. until
18  1:54 p.m.)
19       MR. O'DONNELL:  Okay.  Back on the record.
20  BY MR. O'DONNELL:
21       Q   So, Mr. Cunningham, do you still have
22  Exhibit 1 in front of you?
23       A   Yes, I do.
24       Q   And Paragraph Number 22, we talked about the
25  internal e-mail, and you don't have that anymore, and

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 125

1  then in your testimony you mentioned a letter.  Are you
2  talking about one and the same communication?
3      A   Yes, I believe so.
4      Q   So the letter is actually an e-mail?
5      A   Yes.  To be sure, I'm not saying I don't have
6  it.  I'm just saying I couldn't find it.  It may be
7  somewhere -- I looked for it, but I haven't found it.  I
8  can look for it again, but I'm sure Health Insurance
9  Innovations has a copy of it.
10     Q   Okay.  Then you were explaining to us that the
11 116 telephone calls that are on Exhibit A to the
12 complaint, that you picked them out by listening to the
13 recordings; correct?
14     A   That's sort of how I did it, not exactly.  So
15 I listened to the recordings.  I would identify caller
16 ID that is violative and seems to be related to Health
17 Insurance Innovations and documented the -- you know,
18 obviously the caller ID.  Then I would look through my
19 phone records to see if there is other calls from that
20 number when compiling this list.
21     Q   The jump drive that I provided to your counsel
22 that had the recordings that were actually produced, do
23 you know that none of them match any of the 116 phone
24 calls that are in Exhibit A to your complaint?
25     A   Is that -- I don't know that.  I do not know

Page 126

1  that that is true.
2      Q   Okay.  Did you make any attempt to make sure
3  that the phone calls that were recorded that pertain to
4  the 116 calls that are on Exhibit A were actually
5  produced to us?
6      A   Say that one more time.
7      Q   Does your attorney have the recordings for the
8  116 calls that are on Exhibit A?
9      A   As we stated, there are not 116 recordings.
10 There are recordings that are responsive and that's --
11 you know, I exported what I could identify.
12     Q   How many?
13     A   I didn't count how many recordings there are.
14     Q   Okay.  So you don't know how many recordings
15 there are from 116 calls?
16     A   No.  I don't.
17     Q   Okay.  Do you know that we don't have any of
18 them?
19     A   You don't have any recordings?
20     Q   For the 116 calls that are on Exhibit A, no.
21     MR. O'DONNELL:  I'm giving you the jump drive
22 back again.
23 BY MR. O'DONNELL:
24     Q   And while she's looking at that, one of the
25 cellphone carriers you use is Verizon; is that correct?

Page 127

1      A   Correct.
2      Q   Okay.  And do you know that Verizon has an app
3  that will block autodialed calls?
4      A   I don't know that they have that, and I don't
5  think -- even if they did have it, I don't think it
6  works.  I've heard of several other apps, but I don't --
7      Q   Have you ever tried Verizon's app?
8      A   Nope.
9      Q   So you don't know whether it works or not?
10     A   I know if it worked, I mean, robocalling
11 wouldn't be an issue.
12     Q   Have you ever tried any of these apps?
13     A   No.
14     Q   Okay.
15     A   I don't think it's my -- I don't think I have
16 any duty or obligation to block people from breaking the
17 laws or making calls that they shouldn't be making in
18 the first place.
19     Q   I respect your opinion, but I just wanted to
20 know whether you made any effort to use any of these
21 various apps?
22     A   No.
23     Q   Okay.  So are there days when you receive over
24 30 calls --
25     A   Yeah.

Page 128

1      Q   -- a day?
2      A   Oh, yeah.
3      Q   And you haven't tried any of these apps?
4      A   No.  I don't -- I'm not sure how the apps
5  work, and I don't know that the apps were even in
6  existence in 2016.
7      Q   Okay.
8      A   And, again, it's not my -- my duty I believe
9  is to -- as an informed consumer and consumer advocate
10 is to -- is to prosecute these claims in court.
11     Q   Okay.  So as a consumer advocate, if you used
12 an app that blocked the calls you wouldn't be advocating
13 anymore?
14     A   I would still have a record of the calls, but
15 as far as evidence, as you talked about, federal rules
16 of evidence and proving a claim, that's -- you need
17 evidence to prove a claim in court.
18     Q   Correct.
19     A   So I wouldn't have evidence of it and that
20 would -- as you indicated, that would -- you know, under
21 the federal rules of evidence, I have a duty to preserve
22 the evidence, not to willfully destroy it and knowingly,
23 you know, block or avoid knowledge of evidence of
24 telemarketing calls.
25     Q   Those would be calls that would not have

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 129

1    gotten through to you?
2        A   Well, there may or may not be a record of
3    them. Again, I'm not sure how the app works versus even
4    if it's blocked is there still a record on my phone
5    bill? I'm not sure exactly of all the various apps and
6    how that would work.
7        Q   Are you aware of a program called YouMail?
8        A   What is it?
9        Q   YouMail?
10       A   YouMail, Y-O-U?
11       Q   Yeah.
12       A   I think I've vaguely heard about it, but I
13   don't -- I don't use it.
14       Q   Why not?
15       A   Why?
16       Q   Pardon?
17       A   Why?
18       Q   Well, do you find -- do you find calls like
19   the ones that are alleged in your lawsuit --
20       A   Again, I've vaguely heard of YouMail. It
21   sounds like an e-mail program. So I'm not sure what
22   that is, really.
23       Q   Okay.
24       A   Or how it works or anything.
25       Q   Have you ever taken any measures or any

Page 130

1    efforts to look into technology that would block your
2    receiving calls that you don't want to receive?
3        A   Yes. It's called a federal lawsuit.
4        Q   Okay. Other than the federal lawsuit?
5        A   No. That's what I think is the most effective
6    way of stopping robocalls.
7        Q   Have you stopped receiving robocalls?
8        A   No.
9        Q   Interesting.
10           So have you ever used a number 828-291-7465?
11       A   Some time ago, yes.
12       Q   How long ago?
13       A   Several years.
14       Q   And how long did you have that number?
15       A   Several years. I don't know. Two, three,
16   four years, something like that.
17       Q   Do you have -- do you maintain that number
18   anymore?
19       A   No.
20       Q   Why not?
21       A   I think I couldn't transfer that one,
22   something like that.
23       Q   Did you use that number in other TCPA lawsuits
24   that you filed?
25       A   I don't know. You would have to look at the

Page 131

1    lawsuits.
2        Q   Can't recall one way or the other?
3        A   Not really. It's entirely possible.
4        Q   Well, how many other cellphone numbers did you
5    have when you had the 828 number?
6        A   I don't know.
7        Q   Did you have any others than the 828 number?
8        A   Maybe.
9        Q   Don't know?
10       A   Don't know. It was a long time ago.
11       Q   Are any of your cellphones on the Do Not Call
12   Registry?
13       A   I don't think so.
14       Q   Either federal or state?
15       A   I don't think so.
16       Q   Why not?
17       A   I don't think it's effective.
18       Q   Okay. Have you ever registered any of your
19   phone calls -- any of your phones on any of the DNC,
20   state or federal?
21       A   No.
22       Q   No?
23       A   No.
24       Q   So how do you know whether they are effective
25   or not?

Page 132

1        A   Because people on DNC still get calls. I've
2    heard from some people anecdotally it gets worse.
3        Q   But you don't have any personal experience?
4        A   As I stated, no.
5        Q   You asked Health Insurance Innovations to go
6    on their DNC list?
7        A   Yeah. I said something to them that triggered
8    that sort of response, that they thought they should do
9    that.
10       Q   Okay. But you haven't asked to have any of
11   your numbers on any national or state DNC?
12       A   Correct.
13       Q   Now, is it -- is it a violation of the TCPA
14   for calls to be made to numbers that are on the DNC?
15           MS. KUBERKA:   Objection; calls for a legal
16   analysis.
17           MR. O'DONNELL:   He's -- he knows the answer.
18   Go ahead and answer.
19           MS. KUBERKA:   He's not an attorney. So --
20           MR. O'DONNELL:   And you can't make walking
21   objections, so please.
22   BY MR. O'DONNELL:
23       Q   Go ahead.
24       A   In my lay opinion, I believe it would be.
25       Q   All right. So if it doesn't work and you're a

33 (Pages 129 to 132)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 133

1  consumer advocate and you had put your number on these
2  DNC lists, you'd have more claims to file, right, as a
3  consumer advocate?
4      A   Hypothetically.  I mean, it calls for
5  speculation a little bit.  Depends on what a judge or
6  jury might find.
7      Q   Okay.
8      A   Could.  Maybe, maybe not.  Depends on the
9  nature of call.
10     Q   Or it might work and you might be free from
11 the calls that you don't want to receive?
12     A   I don't -- I sue people, and I still get calls
13 from them.  So if something as extreme as suing
14 people -- I shouldn't say extreme, but something as
15 deliberate and clear and conspicuous as suing someone
16 doesn't trigger a response, I don't think any sort of
17 do-not-call list or anything is going to have a more
18 effective response than that.  It's probably going to be
19 less effective.
20     Q   Could you answer that question "yes" or "no"?
21     A   I gave my answer.
22         MR. O'DONNELL:  Any luck?
23         MS. KUBERKA:  What?
24         MR. O'DONNELL:  Any luck?
25         MS. KUBERKA:  Any luck with what?

Page 134

1          MR. O'DONNELL:  Finding any of the recordings
2  of the recordings that you provided us that are on
3  the flash drive that I gave to you with the calls
4  on Exhibit A.
5          MS. KUBERKA:  No.
6          MR. O'DONNELL:  Okay.
7          Let's -- this is off the record.
8          (Off-the-record discussion held.)
9  BY MR. O'DONNELL:
10     Q   So, Mr. Cunningham, did you -- did you publish
11 something called "Tales of the Debt Collection
12 Terrorist: How I Beat the Credit Industry at Its Own
13 Game and Made Big Money"?
14     A   Nope.
15     Q   You didn't help write that with somebody named
16 Brian O'Connell?
17     A   No.
18     Q   Really?
19     A   Really.
20     Q   Who wrote it?
21     A   Nobody wrote it.
22     Q   How do you know that?
23     A   Because it was supposed to be about me.  There
24 was a book.
25     Q   Yeah.

Page 135

1      A   I participated in it, and there would be a
2  copy of it.  I wouldn't have it.
3      Q   What happened?
4      A   If there were a book that I were participating
5  in the publishing of, there would be a book.
6      Q   Do you know who Brian O'Connell is?
7      A   Yes, he contacted me a few years ago.
8      Q   Is there any type of a draft or manuscript
9  with that title?
10     A   Nope.
11     Q   Did anybody try to author a book like that?
12     A   He may have.  Again, I can only tell you what
13 exists or doesn't exist, and it doesn't exist.
14     Q   So there wouldn't be a work of you detailing
15 your personal experience being hounded by debt
16 collectors after failing -- after falling $100,000 in
17 debt?
18     A   Nope.  If you find one, let me know.
19     Q   Well, you know, if you Google the name of the
20 book, you will see that it is -- reflects that the
21 author is you and a Brian O'Connell.  It will say the
22 category.  There is other articles saying that after
23 people started asking questions about it, you took it
24 off of the ability to view it.  And there is somebody
25 else that posted, if you use, like, a way-back or

Page 136

1  go-back search that you can find references to it.  Do
2  you know, is any of that accurate?
3      A   I can't comment on what people talk about on
4  the internet.  I heard a long time ago you shouldn't
5  believe everything you hear on the internet.
6      Q   Okay.  Was Brian O'Connell ever a
7  representative of yours?
8      A   He was a literary agent.
9      Q   All right.  And for what works did he
10 represent you as an agent?
11     A   He had an interest in potentially doing a book
12 on my experiences; but like I said, there is no book.
13     Q   Was there any proposed title for the book?
14     A   You just read the proposed title.
15     Q   Okay.  Was there any drafts ever prepared?
16     A   Not that I know of.
17     Q   And what happened?
18     A   It wasn't published.
19     Q   Why not?
20     A   It wasn't written.
21     Q   Why not?
22     A   You would have to ask Brian O'Connell that.
23     Q   Well, he was your agent.  Did you as the
24 creator of the work ever produce any drafts or
25 manuscripts?

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 137

1      A    You already asked about drafts or manuscripts.
2  It's not changed in the last two minutes.
3      Q    Okay.  Do you need to take a call?  I see you
4  are looking at your cellphone.  We can take a break if
5  you like?
6      A    I'm good.
7      Q    It's important that your testimony is
8  accurate.
9      A    Sure.
10     Q    And that I have your attention.
11     A    You got most of it.
12     Q    Are you being distracted at all or --
13     A    No.  I'm just looking you mentioned these
14  calls and the calls on here, and I thought I sent those.
15     Q    Are you able to access that information?
16     A    That's -- I'm looking on this Google Drive and
17  just trying to see.
18     Q    Now, what phone are we using?
19     A    This is Moto something.
20     Q    Okay.  And who is the carrier for that phone?
21     A    Republic Wireless.
22     Q    And which number is on that phone?
23     A    1977.
24     Q    Have you ever used the phone number
25  615-484-9476?

Page 138

1      A    That has not been registered to me.  It's
2  possible that it could have been one that someone called
3  that calls forwarded to me.
4      Q    Can you explain how that works?
5      A    Not really.  It's not my number.
6      Q    So how do you know about the number?
7      A    I've heard people say that that's the number
8  they called.  I don't know that.  I didn't place the
9  calls.
10     Q    Okay.  What people have said that?
11     A    Telemarketers or defendants in cases.
12     Q    Have said that you use that number?
13     A    They said that that's the number that they
14  called.  Again, I can neither confirm nor deny.  I can
15  just relay hearsay to you about what they said they did.
16     Q    But that's not a number you've ever used or is
17  associated with you?
18     A    Correct.  It's not -- I'm not the subscriber
19  of record for that number.
20     Q    Okay.  Do you know who is?
21     A    Again, no.  I don't know.
22     Q    Have you ever had that number ported to your
23  number for any --
24     A    No.  This is not within my control, custody,
25  knowledge, information.  I can only tell you the hearsay

Page 139

1  what other people said they did.  I don't know that they
2  did that.  I haven't seen proof that they did that.
3  That's just things people say.  It may be true; it may
4  not be.
5      Q    It may be true?
6      A    It may be true; it may not be true.  I don't
7  know that what someone randomly tells me without
8  evidence to support it is true or not true.
9      Q    Is there a form letter that you send out for
10  making TCPA claims?
11     A    No.
12     Q    Where you just add the name to what's an
13  otherwise form letter?
14     A    No.
15     Q    A form letter that would start out, "My name
16  is Craig Cunningham.  I write to bring to your attention
17  a telemarketing concern of mine related to" and then you
18  insert the company?
19     A    I keep saying no all day long.
20     Q    Okay.  Do you know that sometimes you write
21  some letters and because they are form letters you get
22  the names of the company mixed up because you don't --
23     A    I see what you did there.
24     Q    What did I do?
25     A    You keep trying to redefine it as a form

Page 140

1  letter, even though I've said it's not a form letter.
2      Q    Okay.  I guess in -- a very similar letter in
3  content that you have sent?
4      A    It might be.
5      Q    Okay.
6      A    I don't know that there is anything
7  particularly unique or different that needs to be said
8  if I choose to send out a letter or not.
9      Q    Well, I'm just talking about a letter that it
10  looks like a standard form letter and it has two places
11  where you insert the name of the company that you're
12  directing it to.  Sometimes you send a letter, and you
13  forget to changes the company in both places.  So it
14  goes to the wrong company, or it's got the -- you know,
15  it's got two companies' names where you only intended to
16  send it to one company?
17     A    If you say so, but I can't -- I can't see what
18  you're looking at, so --
19     Q    Okay.  I'm just asking you.  That's all.  You
20  said you didn't --
21     A    You look like you are referring to something,
22  but it's not an exhibit, so --
23     Q    Okay.
24     A    Hypothetically, I have sent e-mails and
25  letters to companies, and maybe I was a little sloppy on

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 141

1   one or another, but --
2       Q   Are you familiar with a site called
3   nationaldebtrelief.com?
4       A   No.
5       Q   Have you ever gone to that website and
6   inserted your name and information to be contacted?
7       A   I don't even know -- I don't know that it is a
8   website. I don't think I've ever been on it.
9       Q   Have you ever provided your contact
10  information on landing pages at websites then to receive
11  calls for which you would claim are in violation of the
12  TCPA?
13      A   Of course not. That's silly. If I did that,
14  those calls, by definition, would not be in violation of
15  the TCPA.
16      Q   And so then after that was brought to your
17  attention, you would not pursue your claim; correct?
18      A   If what? Again, we are talking hypotheticals
19  here. If what was brought to my attention?
20      Q   Let me see if this is a clean copy.
21      MR. O'DONNELL: Do you have a clean copy?
22      MR. ABRAHAMY: Yes.
23      (Exhibit Number 2 marked for identification.)
24      MS. KUBERKA: Wasn't the thumb drive number 2?
25      MR. O'DONNELL: I didn't mark it.

Page 142

1       MS. KUBERKA: Okay.
2       MR. O'DONNELL: I mean, if you'd like a copy,
3   if you ask me, we downloaded it from your system.
4       MS. KUBERKA: Yeah. We might just want to
5   qualify --
6       MR. O'DONNELL: Yeah, sure.
7       MS. KUBERKA: -- because I think -- or clarify
8   it for the record because I think you did refer to
9   it as Exhibit 2 at one point.
10      MR. O'DONNELL: Oh. All right. I didn't mean
11  to mark it. But, again, if you want a copy, we
12  have it.
13      MS. KUBERKA: We have a copy.
14      (Off-the-record discussion held.)
15  BY MR. O'DONNELL:
16      Q   So you have in front of you, Mr. Cunningham,
17  your responses to our request for production?
18      A   Yep.
19      Q   Really the only reason for marking this -- and
20  I think if you look through the pages of it, you will
21  see that -- I'm going to go to -- for example, if you
22  look at the response to Number 18, basically what I'm
23  trying to confirm -- and we can do it through your
24  attorney or through you -- that what we received in
25  response to the request for production were exhibits

Page 143

1   that your law firm marked as Exhibit A, Exhibit B,
2   Exhibit C, Exhibit D, Exhibit E, Exhibit F, and
3   Exhibit G?
4       A   That's what's on the paper.
5       Q   Okay. So what I wanted to do is I wanted to
6   mark those exhibits, and what we did is we took the
7   exhibits, and we actually Bates-numbered them. What
8   that means that at the lower right-hand column -- at the
9   lower right-hand page of each document it bears a
10  distinct number that's in chronological order.
11      A   Okay.
12      MR. O'DONNELL: I'm going to mark the first
13  three, Exhibit A, Exhibit B, Exhibit C, and just I
14  guess, then, these will be Exhibit 3, 4, and 5 for
15  the deposition purposes.
16      (Exhibit Number 3, Exhibit Number 4, and
17  Exhibit Number 5 were marked for identification.)
18      (Off-the-record discussion held.)
19      MR. O'DONNELL: Okay. So can we go back on
20  the record?
21      MS. KUBERKA: Yes.
22      MR. O'DONNELL: Okay. I'm just trying to get
23  through this so we can get it done.
24  BY MR. O'DONNELL:
25      Q   If you will take a look at we've marked as

Page 144

1   Exhibit Number 3, Mr. Cunningham.
2       A   Okay.
3       Q   That -- those are the file names for the
4   recordings that were produced to us. And they are Bates
5   numbered Plaintiff's 1 through 11.
6       A   Okay.
7       Q   Okay? I don't have any questions of you other
8   than to tell you that's what your Exhibit A was and
9   that's what was produced in response to the request for
10  production as Exhibit A.
11      A   So these are -- I'm just trying to understand
12  the source of this.
13      Q   The source of this would be your lawyers, and
14  it will be the file named Exhibit A that they produced
15  to us. And what they are copies of the file names for
16  the recordings. They are not the actual recordings.
17  They are just a copy of the file names of the recordings
18  that I provided to -- that your lawyer provided to us
19  that she was listening to on her laptop on the flash
20  drive that I provided. Okay?
21      A   All right. So Exhibit A, those are the actual
22  like -- you got that from Dropbox?
23      Q   I received that from -- how -- however was
24  produced to your -- from your lawyers, that's how we
25  received it.

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 145

1     MS. KUBERKA:  So we are aware that there are
2  additional recordings that it looks like didn't get
3  produced.
4     MR. O'DONNELL:  Sounds like an issue for
5  another day, but I appreciate that.
6     MS. KUBERKA:  We'll follow those up.
7     MR. O'DONNELL:  Okay.
8  BY MR. O'DONNELL:
9     Q   So then --
10    MS. KUBERKA:  I just want to clarify for my
11 client, the Dropbox that they are talking about is
12 the one that was set up specifically for producing
13 the discovery responses, not the Dropbox that we
14 have with you.
15    THE WITNESS:  Got you.  Okay.
16 BY MR. O'DONNELL:
17    Q   So then Exhibit Number 4 is what has been
18 produced by plaintiffs as Exhibit B.  And that's numbers
19 PL 12 through 46?
20    A   Okay.
21    Q   This is some policy information that you
22 provided to us.  And it shows that purchases that you
23 made and the companies that issued the policies and some
24 of the refund information where you purchased a policy
25 and then canceled and asked for a refund?

Page 146

1     A   Yep.
2     Q   So this is what we have?
3     A   Okay.
4     Q   If you'll look at Exhibit 5, this is what was
5  produced as Exhibit C to your production, and it is
6  marked plaintiff's 47 through 123.  And this is more
7  policy information that was produced.
8     A   Okay.
9     Q   Now, if you turn to 48, that's the second page
10 in.
11    A   Yeah.
12    Q   See where it says 48 at the bottom?
13    A   Yep.
14    Q   It lists your street address up at the top as
15 5543 Edmondson Pike, Suite 248, Nashville?
16    A   Yep.
17    Q   Now, what address is that?
18    A   That's the mailing address that we talked
19 about in the beginning.
20    Q   Okay.  So that's a mailing address, not your
21 residence?
22    A   Correct.
23    Q   Then if you go to the Page Number 74?
24    A   Okay.
25    Q   It uses that same 5543 Edmondson Pike address

Page 147

1  in Nashville.  Do you see that?
2     A   I do.
3     Q   And then there is a day phone listed.  What is
4  that number?
5     A   615-403-4644.
6     (Off-the-record discussion held.)
7  BY MR. O'DONNELL:
8     Q   So which cellphone number is that?
9     A   Again, that may be a number that forwards to
10 one.  I -- I didn't write this document so I can't
11 testify about how that came to be.  You should probably
12 ask whoever the agent is.
13    Q   Okay.  So that's not a number you know
14 anything about?
15    A   It's not a number I own, control, or is
16 assigned to me.
17    Q   That wasn't my question, Mr. Cunningham.
18       Do you have any knowledge about this number,
19 615-403-4644?
20    A   Yeah, I've heard that -- I mean, again, as it
21 shows here, I've heard that it rings to my phones.  I
22 don't know that that's true.  I don't know whether it's
23 not true.
24    Q   Have you ever made any effort to investigate
25 it?

Page 148

1     A   That's not my number.  Nope.  I have no
2  custody, control -- again, as I -- there are laws on
3  this sort of thing as far as privacy, and you can't
4  just -- this is -- telemarketing is an issue.  You can't
5  just get subscriber information just by asking for it.
6     Q   I'm sorry.  I didn't understand.
7     A   There are laws that relate to privacy, similar
8  to the TCPA, if you don't want people to be bothered.
9  The subscriber of record for a phone number is generally
10 confidential.  You can't just get it by asking for it.
11 You generally have to subpoena it and it's not --
12    Q   I don't understand the point you're making?
13    A   My point is it's not my number.  So you are
14 asking did I ask about information, you know, to ask
15 about it.  I can't.  It's confidential.
16    Q   Oh.
17    A   It's protected by law.  You can't just call
18 the phone company and say, "Hey, who is the subscriber
19 of record for 615-403-4644?"
20       They are going to tell you, "We can't tell
21 you.  It's illegal for us to tell you.  We can't do it."
22       So my point is it's a bit futile to try and
23 figure out whose number this is.  It's not mine.  I
24 don't control it.
25    Q   It seems to pop up quite frequently with

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 149

1   respect to your contact with people?
2       A   I disagree with your characterization.
3       Q   Okay.  It does pop up in connection with you?
4       A   Maybe according to what -- again, according to
5   hearsay, according to what these people, if that's even
6   the people, the agents -- if those are even the agents
7   that I spoke with.  Maybe they are saying by reference
8   that that's a number they call.  I don't know what
9   number they called.
10      Q   Do you ever use any technology to conceal the
11  actual number that you are calling from?
12      A   Nope.  That's called caller ID spoofing, and I
13  don't engage in that either.
14      Q   Okay.  But if someone received a call from you
15  from one of the cellphone numbers that you gave me but
16  it was coming up as ID number as 615-403-4644, that
17  would be a caller ID spoofing?
18      A   It could be.  Again, I -- that's not my
19  number.  I can only control my phones that are assigned
20  to me.  And as far as I know, everything anyone's ever
21  told me when I dial from 615-348-1977, it shows up as
22  615-348-1977.  So that's all I can testify about is my
23  phones, what I do.
24      Q   So then if you go in to Page 117.
25      A   Yeah.

Page 150

1       Q   Now, for this one you give an address of
2   3000 Custer Road, Unit 207 to 206, Plano, Texas;
3   correct?
4       A   Yes.
5       Q   What's that address?
6       A   Oh, it's a mailbox.
7       Q   Okay.  It's not a residence?
8       A   Nope.
9       Q   Okay.  So when do you decide to use the two
10  different mailbox addresses?
11      A   You are presuming there is a decision that
12  goes into it.  It's not much thought put into it.
13      Q   Why do you have two different mailboxes?
14      A   For the same reason, I have multiple handguns
15  and the same reason I have multiple cellphones.  Not a
16  bad thing to have.
17      (Off-the-record discussion held.)
18      MR. O'DONNELL:  I actually have a copy of D
19  for you.  When we get to E, I'm not going to have a
20  copy for you.
21      MS. KUBERKA:  Okay.
22      MR. O'DONNELL:  I can get you -- we can send
23  you the PDF.  Okay?
24  BY MR. O'DONNELL:
25      Q   So -- all right.

Page 151

1       (Exhibit Number 6 marked for identification.)
2       (Off-the-record discussion held.)
3   BY MR. O'DONNELL:
4       Q   So you should have in front of you your
5   Deposition Exhibit Number 6.
6       A   Yep.
7       Q   And it is Exhibit D from your production of
8   documents and is Bates-numbered Plaintiff's 124 through
9   780.
10      A   Um-hum.
11      Q   Okay.  Really don't have any other --
12      A   Definitely plant a tree.
13      Q   -- questions of you about it other than --
14      A   Okay.
15      Q   -- I just want --
16      A   That's a lot of paper, yep.
17      Q   -- to make a record of that being what we
18  received.
19      (Exhibit Number 7 marked for identification.)
20  BY MR. O'DONNELL:
21      Q   I only have one copy of this.  So I'll -- no.
22  I've got two copies.  Okay.  So this is going to be
23  Number 7.
24      So we've marked as your Deposition Number --
25  Exhibit Number 6 what you have produced as Exhibit E

Page 152

1   which are pages numbered plaintiff's 781 through 1133.
2       MR. ABRAHAMY:  I think this is 7.
3       MR. O'DONNELL:  It is.  Sorry.
4       (Off-the-record discussion held.)
5   BY MR. O'DONNELL:
6       Q   Exhibit Number 7 purports to be a list of
7   telephone calls.  Do you see that?
8       A   Yep.
9       Q   Do you know why this was produced?
10      A   Because you asked for it.
11      Q   And what does this purport to be?
12      A   These are call records.
13      Q   For whom?
14      A   For me.
15      Q   For you for what case?
16      A   I believe they are in this case.  I mean, I'm not
17  sure I understand the question.
18      Q   Okay.  Do you know whose numbers are in this
19  list, in this Exhibit Number 7?  For example, do you
20  know that there are numbers for attorneys in here?
21      A   I'm sure there are.
22      Q   Are you suing Health Innovations, Inc. for
23  calls that you had with attorneys that represent you?
24      A   No, this -- I mean, ideally they should be
25  redacted, but --

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 153

1    Q   Well, there is, like, over 3,000 calls here?
2    A   Are you unaware that I get a lot of
3  telemarketing calls?
4    Q   I -- I -- I don't know what you do or what you
5  don't do. I spent a great amount of my time today
6  trying to understand it. I'm not quite sure I
7  understand it.
8    A   What part are you unclear on?
9    Q   What I'm unclear on what Exhibit 7 represents.
10  Why did you produce this bunch of documents to us in
11  this case?
12    A   Again, you asked for it.
13    Q   Where did I ask for it?
14    A   Evidence or documents that -- all documents
15  demonstrating that HIPH made any of the phone calls
16  subject in the complaint. We talked extensively about
17  Exhibit A and how in the world could you possibly
18  compile these phone records.
19    Q   Well, I was -- now we are on Exhibit 7?
20    A   Okay. Well, I'm just saying you were asking
21  me "How do you do this? How do you do Exhibit A?"
22    Q   I'm asking --
23    A   And this is how you do Exhibit A.
24    Q   I'm --
25    A   It's about as fun for you to read through it

Page 154

1  as it was for me to make it.
2    Q   Okay. I'm asking you why you produced
3  Exhibit 8 [sic] to us?
4    A   You asked for it.
5    Q   And where did we ask for it?
6    A   I just -- again, Request Number 18, probably
7  some of the other requests too, if you want to go
8  through it.
9    Q   And you believe all of these 3,000-plus calls
10  have anything to do with this case?
11    A   I'm sure that the call records here or other
12  call records are on there. Actually, let's look through
13  here. 8-23.
14    Q   Mr. Cunningham, do you know -- I want to talk
15  a second about the lawsuits in Tennessee.
16    A   Okay.
17    Q   Do you know that in the lawsuit in Tennessee
18  you produced to them this same Exhibit Number 7 of calls
19  that you were suing them for?
20    A   It would seem -- probably would be the same
21  evidence if they are related to the calls.
22    Q   Okay. So the calls you are suing for in this
23  case are the same calls you are suing for in the
24  Tennessee case?
25    A   Again, the last time you asked the question,

Page 155

1  I'll repeat it, most of them are. It's going to depend
2  on which policies, which agent, which insurance company
3  and so forth. I -- I note Health Insurance Innovations
4  has gone through a couple different ones, and the more
5  recent calls I've gotten, for example, in 2018 or 2019
6  don't have all the same insurance companies and so forth
7  that they had in 2016. So that may change. But, you
8  know, it's -- it's relevant and related to Health
9  Insurance Innovations on the calls they placed.
10    Q   Why did you produce the exact same call
11  records in both cases?
12    A   Because it's the exact same calls.
13    (Exhibit Number 8 marked for identification.)
14    MR. O'DONNELL:  So this is going to be number?
15    THE REPORTER:  8.
16    MR. O'DONNELL:  8.
17  BY MR. O'DONNELL:
18    Q   Okay. Mr. Cunningham, we have in front of you
19  what we've --
20    A   I want to expound on my answer real quick.
21  You asked about why did I produce this? If you look on
22  8-23 on Exhibit 7, this is Page 841, PL 00841, there is
23  a call inbound at -- on August 23rd, 2016, which
24  corresponds to Call Number 1. It looks like -- yeah,
25  13:53, which is 1:53. That's UTC time. 731-501-1075,

Page 156

1  and it looks like it was cut off, but I would bet every
2  dollar I own, everything that I own that that is 1075.
3    So you asked why I produced it. That's why I
4  produced it. That a page specifically referencing one
5  of the calls on Exhibit A, and you asked about "How do
6  you make Exhibit A? How could you possibly know? There
7  is no way. How could you know?"
8    Because you look through this.
9    Q   Okay. I think you should stop gambling, but I
10  appreciate your answer.
11    A   I'm just -- you asked, and you said you
12  weren't clear. So I want to be clear Exhibit 7 is how
13  you get to -- Exhibit 7 of the production, Exhibit E,
14  Exhibit 7 in deposition is how you get to Exhibit A of
15  the complaint, which you asked about. Just being clear.
16    Q   So Exhibit Number 8 that's in front of you --
17    A   Okay.
18    Q   -- this was what was produced as Exhibit
19  Number F, and it's marked Plaintiff's 1134 through
20  Plaintiff's 1135. It's two pages. Do you have it in
21  front of you?
22    A   Yep.
23    Q   And can you tell me why this document was
24  produced?
25    A   Again, you asked for it.

39 (Pages 153 to 156)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 157

1    Q   What did we ask for?

2    A   Your -- it's your production.  It's your

3  request.

4    Q   Okay.  So this purports --

5    A   Any evidence, all documents demonstrating that

6  HIPH made any of the telephone calls, Interrogatory

7  Number -- or Request Number 5, "Documents by, to, from

8  or any person identified" that pertain -- "identified

9  responsive Interrogatory Number 1 which pertains to any

10  fact alleged in the pleadings filed in this action, or

11  any fact underlying the subject matter of this action.

12        So as I have a cellphone and it is

13  615-348-1977 and Republic Wireless is the carrier, that

14  would relate to the facts alleged in the complaint.

15    Q   Why did you produce these two particular

16  bills?

17    A   I believe there was a question of if I was a

18  subscriber of record at the time for 615-348-1977 which

19  would go to standing to bring the case.

20    Q   Okay.  So the first page is a bill for $48.21,

21  and it looks like there is a -- some type of credit card

22  information that you had paid this bill; right?

23    A   Correct.  And also to expand why -- why these

24  documents, I mean, you did specifically ask in Request

25  Number 12 for billing statements for your cellphone

Page 158

1  number that is the subject of the complaint.  I'm not

2  sure if you can get any more specific than that.  You

3  asked for it.  That is a billing statement.  Exhibit 8

4  is a billing statement.  That's all I have.

5    Q   We asked for billing statements?

6    A   Um-hum.

7    Q   You provided two?

8    A   Okay.

9    Q   So my question back to Exhibit Number 8, the

10  first page --

11    A   Yep.

12    Q   -- 1134 is what period of time does this bill

13  cover?

14    A   January 11th, 2016.

15    Q   And if you look at Page 2, what period of time

16  does that cover?

17    A   January 11th, 2019.

18    Q   Are there any other bills that were produced

19  in response to our request for production anywhere?

20    A   I don't think so.  I mean, this is just to

21  cover to show that I've had the phone the whole entire

22  time.  I mean, if you want every single bill or if

23  you -- if there is a question, if you're, you know,

24  challenging that, I'm sure you could subpoena Republic

25  Wireless, and they would be happy to give you

Page 159

1  everything.  Because, again, I'm not the custodian of

2  record.  Republic Wireless is.  And I'm telling you that

3  the custodian is the one that got it for me.

4        MR. O'DONNELL:  I actually have a copy of that

5    for you.

6        (Exhibit Number 9 marked for identification.)

7  BY MR. O'DONNELL:

8    Q   So you have in front of you what we've marked

9  Exhibit Number 9, which is a one-page document you've

10  produced as Exhibit G, which we Bates-numbered

11  Plaintiff's 1136.  Do you have it in front of you?

12    A   Yep.

13    Q   And this looks like the same copy of an e-mail

14  that's attached to your complaint as Exhibit B, only

15  this particular document has some additional information

16  which shows it being e-mailed from Mark Grabowski to

17  you?

18    A   Correct.

19    Q   Okay.  So the reason I marked those is simply

20  that we have a record of Exhibits A through G that you

21  produced and that we've Bates-numbered them so the

22  record is clear.  If we've missed something, you know,

23  please let us know, okay?

24        MS. KUBERKA:  Okay.

25  BY MR. O'DONNELL:

Page 160

1    Q   Now -- so what I --

2        MR. O'DONNELL:  Give this to you first.

3    This is going to be Number 10.

4        (Exhibit Number 10 marked for identification.)

5  BY MR. O'DONNELL:

6    Q   So what I've marked as Exhibit Number 10 --

7    A   Okay.

8    Q   -- are four pages, and they are numbered

9  Plaintiff's 1138 through 1141.

10    A   Okay.

11    Q   And now Exhibit 9 that we marked is actually

12  1136.  So you'll see there is no 1137.  And the reason

13  for that is we were provided five Excel spreadsheets.

14    A   Yep.

15    Q   That look like they contain call information

16  and then there was a summary page on each Excel

17  spreadsheet.  So Exhibit 10, Page 1138, -39, -40,

18  and -41, are the summary sheets of what looks like was

19  extracted out of four of the Excel sheets that looks

20  like the calls that you have an issue with in this case.

21  I don't know whether that's true or not.  That's just

22  the way it looked to us.

23    A   Yeah.  These are some of them.

24    Q   Okay.

25    A   Some of the calls.

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 161

```
 1      Q   So there is -- these are the four summary
 2  pages from the four Excel sheets.  There was a fifth
 3  Excel sheet that there was some type of internet glitch
 4  or we haven't got yet.  It's kind of on its way.  I
 5  suspect that that's going to have a summary sheet the
 6  same as this, and when we get it, we'll go ahead and
 7  mark it as 1137 so it's sequential.
 8      A   Okay.
 9      MR. O'DONNELL:  We actually didn't get the
10  first Excel spreadsheet.  It didn't come through.
11  Okay?
12      MS. KUBERKA:  Okay.
13      MR. O'DONNELL:  I think you know about that;
14  right?
15      MS. KUBERKA:  This is -- I mean, today is the
16  first time that I've heard of it.
17      MR. O'DONNELL:  Okay.
18      MS. KUBERKA:  I don't know if you are
19  referring to a spreadsheet for October.
20      MR. O'DONNELL:  I forget what month, but there
21  is an Excel spreadsheet.
22      MS. KUBERKA:  I know we don't have an Excel
23  spreadsheet for October.  So I hope that's not the
24  one you're holding out for.
25      MR. ABRAHAMY:  That is the one he's referring
```

Page 162

```
 1  to.
 2      MS. KUBERKA:  All right.  We don't have that.
 3      MR. O'DONNELL:  Well, how come they didn't
 4  send it to us?
 5      MR. ABRAHAMY:  They weren't able to.
 6      MR. O'DONNELL:  Oh, you are saying you don't
 7  have it.
 8      MS. KUBERKA:  We don't have it, which is why
 9  we weren't able to.
10      MR. O'DONNELL:  Oh.  So you only have four of
11  the Excel spreadsheets that match up with the hard
12  copy, not the fifth one.
13      MS. KUBERKA:  Correct.
14      MR. O'DONNELL:  Oh.
15      Is that something you expect to get from
16  Mr. Cunningham, or how does that work?
17      MS. KUBERKA:  I'm unaware if that's in my
18  client's possession.
19      A   I know I sent one that had, like, 350 or so
20  calls that was like everything -- it was more
21  comprehensive than just -- I think I compiled these from
22  2016, the beginning of 2017, and then there were
23  additional calls after that.  Yes.  It looks like the
24  end of 2016.  So there are additional calls, and the 350
25  or so went through the fall of 2017, as I recall.
```

Page 163

```
 1  BY MR. O'DONNELL:
 2      Q   We don't have anything about that.  All we
 3  know is the lists that have been provided to us, which
 4  is the one that's attached to the complaint, and what
 5  could be a list, I'm not sure, that's attached as
 6  Exhibit Number 10, unless you are able to -- unless you
 7  are able to -- do you know what Exhibit Number 10 is?
 8      A   Yeah, I mean this -- yes.  This looks
 9  familiar.  These are the -- you know, Excel spreadsheet.
10  I didn't make it pretty with the --
11      Q   Okay.  So are there any more calls you have
12  issue with other than that's on Exhibit 10, because
13  that's all we have?
14      A   Oh, absolutely.  Like I said, in part --
15      Q   All we have is Exhibit 10?
16      A   Well, it's in the -- it should be in the
17  Dropbox, and I think there is a little issues with the
18  permissions on that.  So it should be on the Dropbox.
19      Q   I don't know.  All I can tell you is what was
20  made accessible to us.  Okay.
21      MR. O'DONNELL:  Let's take a short five-minute
22  break maybe.  Comfort break.
23      (Recess taken from 3:05 p.m. until 3:21 p.m.)
24  BY MR. O'DONNELL:
25      Q   Just have a couple more questions,
```

Page 164

```
 1  Mr. Cunningham.
 2      A   Okay.
 3      Q   For any of the policies that you purchased --
 4  well, wait a minute.
 5      For all the policies you purchased, you
 6  canceled them, correct, and you asked for refunds?
 7      A   As far as I know.
 8      Q   Okay.  Are there any refunds that you didn't
 9  receive?
10      A   There very well could be.  I mean, there is so
11  many calls, so many different agents, agencies,
12  brokerages.  It's entirely possible I might have missed
13  one or two.
14      Q   Okay.  Well, I'm talking about this case.  Can
15  you identify --
16      A   In this case, it's still a lot of calls and a
17  lot of policies, and you're going back two, three, you
18  know, years.
19      Q   Right.
20      A   And it's entirely possible that over the
21  course of hundreds of phone calls and over the course of
22  two or three years that I very well could have missed
23  it.  So --
24      Q   Not asked for a refund?
25      A   Yes.
```

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page 165

1    Q   Okay.  But just as you sit here today, you're
2   not claiming you are owed any money for refunds?
3    A   I very well could be, but --
4    Q   But right now you don't know?
5    A   Correct.
6    Q   Okay.
7    A   We would have to look at the charges and when
8   that occurred and when a refund happened and line all
9   that stuff up.
10    Q   Okay.  Is that part or not part of your case?
11    A   I mean, it would be.  Obviously, I don't want
12   to pay Health Insurance Innovations for, you know, their
13   awful insurance.
14    Q   Well, you know, today's the day.  So we
15   thought we would be here to find out finally what the
16   case was about, and I just -- if I understand correctly,
17   you don't know whether or not you have refunds that are
18   due or whether or not you were completely refunded for
19   everything?
20    A   Well, I mean, we don't know all the details on
21   the calls.  I mean, I -- I don't think I've seen
22   anything on --
23    Q   I'm not talking about the calls.  I'm talking
24   about the products that you purchased.
25    A   Right, but there is a chain of this.  There is

Page 166

1   a flow of this.  Right.  You have to line up the -- the
2   policies didn't just come from nowhere.  Right.  I
3   didn't just wind up with a charge on my credit card.
4   There was a call from them or one of their agents,
5   brokers, whatever, to me.  There was a policy issued.
6        And that's how I think about it.  That's how I
7   track it.  You know, if there is a call, then there is a
8   policy issued.  Then I, you know, get my money back or
9   dispute it later or whatever.  Then that's kind of the
10   flow of how it would work.  It wasn't a letter.  It
11   wasn't an e-mail.  They were calls.  That's what we are
12   here for is to talk about the telemarketing calls.
13   So --
14    Q   I'm just asking you --
15    A   -- hundreds of calls over a period of several
16   years --
17    Q   Not talking about calls.  Let me ask you
18   again.
19    A   Okay.
20    Q   Is there any refund that you have requested
21   that you have not received for a policy that you bought
22   and then canceled?
23    A   It's entirely possible.  I have not --
24    Q   I'm not talking about possibilities.  As you
25   sit here today, is there any one that you can identify?

Page 167

1    A   I'm not --
2    Q   Yes or no?
3    A   Sure.
4    Q   Okay.  You're not sure?
5    A   Like I said, I did my best to stay on track of
6   the policies that came in and the corresponding calls
7   and get my money back later, but it's entirely possible
8   over several years I got distracted and one or two of
9   them slipped through.  Totally possible.
10    Q   Equally as possible that that didn't happen?
11    A   Maybe.  I think I was pretty good about
12   staying on top of it.  But, again, I can't say with
13   absolute certainty that I've got every single one.
14   Health Insurance Innovations's records, your client's
15   records would show that.  I don't think they have that
16   many people named Craig Cunningham that have bought
17   policies, especially with the addresses that you have.
18   I mean, they should be able to readily identify that.
19    Q   Did you buy any policies under names other
20   than Craig Cunningham?
21    A   I don't think so.  Again, given the lies,
22   false caller ID information, agents that I may or may
23   not have spoke to, it's -- can be a little tricky
24   sometimes to line up every single call with Health
25   Insurance Innovations.  As we sit here with over a

Page 168

1   thousand pages of documents, plus calls, call recordings
2   and, again, trying to straighten all that out now, as
3   you testified -- or you stated yourself, that it can be
4   a little difficult to kind of line all this up in the
5   volume of paperwork.  So that's with you and associates
6   and paralegals and assistants and people helping you out
7   do it.  It's just me.
8    Q   I think we've got it pretty well lined up.  I
9   was just wondering whether or not you had any specific
10   information about any policy that you had purchased
11   under any name and a premium that you were still waiting
12   to receive?
13    A   And I'm just saying it's -- it's -- it's --
14   you have more resources at your disposal to look
15   through, you have more time.  I just get a call, and I
16   either answer it or I don't.
17    Q   You have a credit card?
18    A   I do.  I have several.
19    Q   And you use them to buy policies?
20    A   Among other things, yes.
21    Q   That you don't need?
22    A   Don't need, yeah.
23    Q   All right.
24        MR. O'DONNELL:  Thank you.  I don't think I
25   have any other questions.

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

## Page 169

```
 1        THE WITNESS:  All right.
 2     (Off-the-record discussion held.)
 3        MS. KUBERKA:  We would like to read it for
 4   accuracy.  Yeah.
 5        MR. O'DONNELL:  And it is ordered.
 6        THE REPORTER:  Copy?
 7        MS. KUBERKA:  Yes, please.
 8     (The deposition ended at 3:26 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 171

```
 1             CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA
 4   COUNTY OF HILLSBOROUGH
 5
 6        I, NIKI MAURINE NOOJIN, Notary Public, State
 7   of Florida, certify that CRAIG CUNNINGHAM personally
 8   appeared before me on April 11, 2019, and was duly
 9   sworn.
10
11        WITNESS my hand and official seal this date:
12   04/22/2019.
13
14   Identification:
15        CRAIG CUNNINGHAM produced Tennessee Driver's License
16
17   _____
18        NIKI MAURINE NOOJIN
     Notary Public
19   State of Florida
     My Commission Expires 3/20/20
20   Commission No. FF 972564
21
22
23
24
25
```

## Page 170

```
 1          CERTIFICATE OF REPORTER
 2
 3   STATE OF FLORIDA
 4   COUNTY OF HILLSBOROUGH
 5
 6        I, NIKI MAURINE NOOJIN, certify that I was
 7   authorized to and did stenographically report the
 8   deposition of CRAIG CUNNINGHAM; that a review of the
 9   transcript was requested, and that the foregoing
10   transcript, Pages 1 through 173 is a true record of the
11   testimony given by the witness.
12
13        I further certify that I am not a relative,
14   employee, attorney, or counsel of any of the parties,
15   nor am I a relative or employee of any of the parties'
16   attorney or counsel connected with the action, nor am I
17   financially interested in the action.
18
19        Dated:  04/22/2019.
20
21
22        NIKI MAURINE NOOJIN
23
24
25
```

## Page 172

```
 1              ERRATA SHEET
 2   IN RE:  CRAIG CUNNINGHAM vs HEALTH PLAN INTERMEDIARIES
     HOLDINGS, LLC d/b/a HEALTH INSURANCE INNOVATIONS; and
 3   DOES 1-100
     DEPOSITION OF:  CRAIG CUNNINGHAM  TAKEN: 04/11/2019
 4   DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE
 5   Please sign, date and return this sheet to our office if
     additional lines are required for corrections, attach
 6   additional sheets.
 7   At the time of the reading and signing of the
     deposition, the following changes were noted.
 8
 9   PAGE LINE CHANGE            REASON
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21
     Under penalty of perjury, I declare that I have read my
22   deposition and that it is true and correct, subject to
     any changes in form or substance entered here.
23
24   SIGNATURE OF DEPONENT:  _____
25   DATE:  _____
```

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

6bc4a1e8-ceaf-4c3b-9d30-766227abed87

Page  173

1     04/22/2019
2
      KELSEY L. KUBERKA, ESQUIRE
3     Law Offices of Todd M. Friedman, P.C.
      21550 Oxnard Street
4     Suite 780
      Woodland Hills, California 91367-7104
5
      Re:  CRAIG CUNNINGHAM vs HEALTH PLAN INTERMEDIARIES
6     HOLDINGS, LLC d/b/a HEALTH INSURANCE INNOVATIONS; and
      DOES 1-100
7
      Dear Ms. Kuberka:
8
      Please find the original errata sheet with your copy of
9     the transcript so CRAIG CUNNINGHAM may read and sign the
      transcript.  Please have him make whatever changes are
10    necessary on the errata sheet and sign it.  Please make
      a copy of the errata sheet and place it in your
11    transcript.  Please then forward the original errata
      sheet back to our office at 101 South Franklin Street,
12    Suite 101, Tampa, Florida 33602.
13    If the errata sheet is not signed by the witness within
      30 days after this letter has been furnished, we will
14    then process the transcript without a signed errata
      sheet.  If your client wishes to waive his signature,
15    please have him sign his name at the bottom of this
      letter and send it back to our office.
16
      Your prompt attention to this matter is appreciated.
17
18    Sincerely,
19
      NIKI MAURINE NOOJIN, Professional Court Reporter
20
21
22    I do hereby waive my right to sign.
23
      CRAIG CUNNINGHAM
24
25    cc:  GARRY W. O'DONNELL, ESQUIRE

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    6bc4a1e8-ceaf-4c3b-9d30-766227abed87